[No. 35622. Department Two. June 22, 1961.]

JORDAN SMITH, *Respondent*, v. AMERICAN MAIL LINE, LTD., *Appellant.*[*]

---

*Reported in 363 P. (2d) 133.

---

[16]"The Present Crisis," James Russell Lowell.

*Bogle, Bogle & Gates* and *Ronald E. McKinstry,* for appellant.

*Levinson & Friedman* and *Sam L. Levinson,* for respondent.

DONWORTH, J.—This is an appeal by American Mail Line, Ltd. (hereinafter called appellant) from a judgment in the amount of seventy-two thousand dollars[1] awarded to Jor-

---

[1]The actual jury award was for eighty thousand dollars, but this was reduced, by a finding of ten per cent contributory negligence, to seventy-two thousand dollars under the provisions of the Jones Act.

dan Smith, a merchant seaman (hereinafter called respondent). Respondent's suit was based on negligence under the Jones Act, 46 U. S. C., § 688, and on unseaworthiness under the general maritime law.

The injury complained of was allegedly sustained by respondent while working as a member of the deck gang of the "China Mail," on February 28, 1957. At the time, the vessel was docked in Los Angeles, California. Principally (with two exceptions), appellant's assignments of error relate to the issue of proximate cause—that is, whether or not the injury sustained on February 28th eventually caused the head injuries on which this action was primarily based. In response to a special interrogatory submitted by the court, the jury answered affirmatively that it found that respondent's ultimate "head and brain condition" was caused by his fall aboard the "China Mail."

The facts pertinent to this issue are summarized as follows:

While attending to his duties aboard the "China Mail" on the date mentioned, respondent slipped and fell. (Since appellant has not assigned any error relating to the issue of liability, we need not describe the circumstances of the fall.) Respondent testified that he landed on his head and elbow. This was corroborated by two eyewitnesses. Respondent (according to his own testimony) complained to other crew members of headaches and dizziness, but primarily of a painful injury to his elbow. The injury report filled out by Chief Mate Ridenour contained no reference to any head injury. The report described only the elbow or arm injury. Similarly, an entry made in the purser's log on the same day made no reference to a head injury.

Later the same day, X rays of respondent's left arm and elbow were taken at the San Pedro Hospital in Los Angeles. After treatment of respondent's arm injury at the San Pedro Hospital, he was flown to Seattle since his home was on Bainbridge Island. He continued to receive treatment at the Seattle Marine Hospital as an out-patient for about one month. Again, the records seem to indicate that the

treatment (X rays and physical therapy) administered was for respondent's arm injury. On March 29, 1957, respondent was pronounced fit for duty. However, for reasons that are not altogether clear from the record, respondent did not return to duty, and continued to reside in the Seattle area until he was admitted to the Seattle Marine Hospital on May 22, 1957—almost three months subsequent to the mishap on the "China Mail." Nonetheless, it should be noted that there is testimony in the record, corroborated by one Evelinn Smith (a friend of respondent with whom he spent a great deal of time during this period), that respondent was experiencing continued headaches and was taking increasingly large quantities of aspirin and "APC" tablets.

On the afternoon of May 21, 1957, Miss Smith found respondent in a trailer in Seattle, where he was living temporarily. She testified that he was clutching his head and looked to be in extreme pain. Miss Smith then notified Richard Anderson, a lifelong friend of respondent, and together that evening they took respondent to the marine hospital. Respondent by this time was in a very serious condition, which was originally diagnosed by Dr. Eldon Foltz, a neurosurgeon at the hospital, as a subarachnoid hemorrhage.

After further examination and treatment, the diagnosis was revised and it appeared that respondent was suffering from two aneurysms (blood-containing tumors), a skull fracture, and an intracerebral hematoma (a collection of clotting blood).[2] The hematoma was removed by an operation performed on respondent by Dr. Eldon Foltz and Dr. John R. Moran on June 6, 1957.

A number of doctors testified for each side, and all seemed to agree that (1) respondent had sustained very serious brain damage of a permanent nature, and (2) respondent's disability was caused by trauma. The dispute in the medical testimony concerns neither the extent, nor the cause, of the injury (trauma); the dispute in the medical testimony

[2]These capsule definitions of aneurysm and hematoma are taken from 4 Lawyers' Medical Cyclopedia (Glossary) 1960.

is as to *when* the trauma occurred. Respondent argued successfully (to the satisfaction of the jury at least) that a preponderance of the evidence showed that the trauma which precipitated the hematoma (the removal of which resulted in respondent's permanent disability) occurred on February 28, 1957, while he was employed on the "China Mail." However, appellant's expert witnesses, including the two surgeons who operated on respondent at the Seattle Marine Hospital, all testified that they believed that the brain damage was caused by a trauma occurring within ten to fourteen days of the time respondent entered the hospital in Seattle, on May 22, 1957.

Our first consideration, therefore, is whether or not the trial court erred in denying appellant's motion for a new trial on the ground that insufficient evidence was offered to support the jury's finding that respondent's fall aboard the "China Mail" was the proximate cause of his ultimate head or brain injury. In a memorandum opinion denying appellant's motion, the trial judge commented as follows:

"I think that the testimony of that doctor plus the testimony of Dr. Klemperer, if believed by a jury, established, although highly unsatisfactory evidence, a question for the jury to pass on, and also, I might state, highly unbelievable evidence. In fact, to me it was shocking that any human being could pay the slightest attention to it, but it amounts to more than a scintilla if believed by the jury."

■ Before we can decide whether the trial court erred, we must initially determine whether the standard to be applied by the trial court, in ruling on a motion for a new trial in a Jones Act case, is covered by the Federal rules and the cases thereunder, or by our own state rules. As stated by the supreme court of Oregon, in *Hust v. Moore-McCormack Lines,* 180 Ore. 409, 177 P. (2d) 429 (1947) (a Jones Act case):

" . . . since we are dealing with the enforcement of an act of Congress, this court is governed as to matters of substantive right by the decisions of the federal courts. [Citing cases] . . ."

In the case of *Cantrill v. American Mail Line, Ltd.*, 42 Wn. (2d) 590, 257 P. (2d) 179 (1953), this court also adopted the position that the decisions of the Federal courts dealing with the interpretation of the Jones Act are controlling in state court actions brought under the act; but, as indicated in the *Hust* case, "where the question is purely procedural, this state [Oregon] may apply its own law."

See, also, Restatement, Conflict of Laws, 702, § 585.

"a. Matters of procedure include access to courts, the conditions of maintaining or barring action, the form of proceedings in court, the method of proving a claim, the method of dealing with foreign law, and proceedings after judgment. . . ."

While there are no cases directly in point on the question in this state, we find the statement of the Oregon court regarding procedural rules in Jones Act cases to be entirely sound.

■ The resolution of the problem now turns on whether or not the grounds for granting a new trial by a trial judge are matters of substance or procedure. We recognize that many of the matters which courts and text writers characterize as "substantive" and those which they characterize as "procedural" often overlap. Clear distinctions cannot always be made. However, as a general rule, conflict of laws questions regarding sufficiency of evidence and quantum of proof are governed by the law of the forum, as these questions are treated essentially as matters of procedure. See 89 A. L. R. 1278, and the cases cited therein. By analogy, we think that the Washington standard (the law of the forum) for deciding a motion for a new trial should obtain in the case at bar.

The grounds for granting a new trial in Washington are prescribed by our rules of court. Rule of Pleading, Practice and Procedure 59.04W, RCW Vol. 0, provides that a new trial may be granted on the ground, among others, that "there is no evidence or reasonable inference from the evidence to justify the verdict or the decision. . . ."

The expert medical testimony offered by respondent to establish the mishap of February 28th as the proximate

cause of his eventual disability consists principally of the following testimony:

(1) Dr. Wolfgang Klemperer, a neurosurgeon, who examined both the respondent personally and the hospital records relating to the case, testified, in essence, that it was medically probable that, absent an intervening accident, respondent's fall aboard the "China Mail" caused his ultimate brain injury.

(2) Dr. Gerald R. Nowlis, another neurosurgeon who had familiarized himself with respondent's medical history, also indicated that he felt there "very probably" was a causal connection between the February 28th fall and the June 6th operation for the removal of the hematoma.

■ On the basis of the testimony of these two doctors, neither this court nor the trial court is in a position to say that "there is no evidence or reasonable inference from the evidence to justify the verdict" (the standard applicable in this case for granting a new trial). This is not to say that the jury might have not been wrong in evaluating the medical testimony. But, whether right or wrong, it was the jury's decision. The jury system is not perfect; it never was and never will be. However, it is an old institution and the very keystone of our judicial system.

As stated by this court in *Johnson v. Department of Labor & Industries*, 46 Wn. (2d) 463, 281 P. (2d) 994 (1955):

"It is evident from the verdict that the jury chose to give greater credence to the opinions expressed by appellant's medical expert than those given in the testimony of respondent's expert. The trial court disagreed with this choice. Even though we might be inclined to concur with the trial court's evaluation of the expert testimony, nevertheless, it is not within the competency of the trial court (nor of this court) to invade the province of the jury and substitute its judgment for that of the jury in weighing the evidence. . . ."

This court cited, in support of this rule, *Omeitt v. Department of Labor & Industries*, 21 Wn. (2d) 684, 152 P. (2d) 973 (1944); *Rettinger v. Bresnahan*, 42 Wn. (2d) 631, 257 P. (2d) 633 (1953); and 53 Am. Jur. 144, § 159.

To summarize, the evaluation of competent but conflicting expert medical testimony is for the jury.

 Appellant also assigns error to the trial court's failure to sustain appellant's objections to long and involved hypothetical questions posed to both Dr. Klemperer and Dr. Nowlis. The grounds for appellant's assignment of error are that the questions included "incomplete, unfair and exaggerated statements of the assumed facts." There is a well-established principle of the law of evidence that the answer to a hypothetical question is inadmissible where there is no testimony in the record to support the facts assumed in the question. See *Weissman v. Department of Labor & Industries,* 52 Wn. (2d) 477, 326 P. (2d) 743 (1958), and *Salesky v. Department of Labor & Industries,* 42 Wn. (2d) 483, 255 P. (2d) 896 (1953). However, it is essentially the duty of the *trial court* to supervise and control the propounding of hypothetical questions.

In this regard, the trial court has wide discretion, and, unless it is clear that this discretion has been abused, the rulings of the trial court concerning hypothetical questions will not be disturbed on appeal. See *Adams v. Town of Bolton,* 297 Mass. 459, 9 N. E. (2d) 562, 111 A. L. R. 856 (1937); *Brown v. Mobile Electric Co.,* 207 Ala. 61, 91 So. 802 (1921); 58 Am. Jur. 481, § 852. Obviously, where complicated and frequently debatable medical issues arise in a case, not all hypothetical questions can always include all material facts, and a certain amount of slanting or misplaced emphasis may inhere in the process. In such cases, it is incumbent upon the trial court to admonish the jury to give credence to the answer only to the extent that it (the jury) finds the facts stated as the hypothesis of the question to be supported by the evidence. Here, the trial court did just that.

In overruling an objection to the hypothetical question asked of Dr. Klemperer, the trial court instructed the jury that:

" . . . The jury will understand that on this hypothetical question, like any other, the value of the answer depends upon how much you think that the hypothetical question substantially and fairly states the facts in accord-

ance with the evidence. If it doesn't accord with the evidence and substantially state the facts, it is naturally up to you to reduce the value of the answer in accordance to it.

"My ruling is this: I am overruling the objection, and the jury is the judge of the substantial accuracy of your hypothetical question. . . ."

The trial court instructed the jury along the same lines with respect to a similar hypothetical question propounded to Dr. Nowlis.

We do not mean to imply that an attorney, through the vehicle of a hypothetical question, should be permitted to introduce or suggest facts which find no support elsewhere in the record. The hypothetical questions posed by respondent, while they included many debatable assumptions and may not have been as complete in other respects as appellant might have wished, did not, we think, assume material facts which were totally unsupported by the record. The trial court did not, in our opinion, abuse its discretion in allowing them to be asked and answered.

Finally, appellant assigns as error the failure of the trial court to grant a new trial based on juror misconduct. Appellant contends that the damage award was increased to provide for respondent's attorney's fee and to offset the deduction for contributory negligence as prescribed by the Jones Act. In support of its contention, appellant submitted the affidavits of two jurors, stating that the factors alluded to above influenced the final verdict.

By the great weight of authority in this country, jurors are not competent to impeach their own verdict. See 8 Wigmore on Evidence (3rd ed. 1940) 690, § 2354, note 2. Under this rule, first enunciated by Lord Mansfield,[3] the testimony of a juror alleging jury misconduct is inadmissible without regard to whether or not the misconduct, if proved otherwise, might warrant reversal. However, in this state, by court rule, an exception has been made to the prevailing common-law rule. Rule of Pleading, Practice and Procedure 59.04W, RCW Vol. 0, provides, in part, that:

---

[3] *Vaise v. Delaeval,* 1 T. R. 11, 99 Eng. Rep. 944 (1758).

" . . . whenever any one or more of the jurors shall have been induced to assent to any general or special verdict . . . other and different from his own conclusions, *and arrived at by a resort to the determination of chance or lot,* such misconduct may be proved by the affidavits of one or more of the jurors; . . ." (Italics ours.)

Since there is no allegation in either of the two affidavits that the verdict was arrived at by means of chance or lot (the only instance where such affidavits would be admissible), the affidavits cannot be considered. See *Johnston v. Sound Transfer Co.,* 53 Wn. (2d) 630, 335 P. (2d) 598 (1959); *Dibley v. Peters,* 200 Wash. 100, 93 P. (2d) 720 (1939), and *Johnson v. Smith,* 118 Wash. 146, 203 Pac. 56 (1921). The trial court, therefore, properly denied appellant's motion for a new trial on this ground as there was no evidence in the record alleging juror misconduct other than the two affidavits.

Finding no merit in appellant's assignments of error, the judgment of the trial court is in all respects affirmed.

FINLEY, C. J., OTT, and HUNTER, JJ., concur.

MALLERY, J., dissents.