CYNTHIA E. PETERSEN, *Respondent,* v. THE STATE
OF WASHINGTON, ET AL, *Appellants.*

*Kenneth O. Eikenberry, Attorney General,* and *Narda Pierce, Assistant,* for appellants.

*Rush, Kleinwachter & Hannula,* by *William J. Rush* and *Vernon W. Harkins,* for respondent.

DOLLIVER, J.—On May 14, 1977, plaintiff Cynthia Petersen was injured in an automobile accident in Tacoma. Plaintiff was making a lawful turn at an intersection when her car was struck by a vehicle driven by Larry Knox. The

Knox vehicle apparently ran a red light and was traveling approximately 50 to 60 miles per hour. Knox appeared to witnesses to be greatly influenced by drugs.

At the time of the accident, Knox was on probation for a second degree burglary conviction. In May 1975, he had been sentenced by Superior Court Judge Hardyn B. Soule to 15 years in prison, suspended, subject to certain conditions of probation. Among the conditions of Knox's probation were that he participate in mental health counseling and refrain from using controlled substances.

Five days before the accident occurred, Knox had been released from Western State Hospital, where he had been receiving psychiatric care. On April 16, 1977, Knox had taken a knife to himself and cut out his left testicle. His brother had found him lying in a blood soaked bed and had taken him to Madigan Army Hospital for emergency medical treatment. After hospital staff reported delusional and hallucinogenic tendencies, Knox was evaluated by a mental health professional pursuant to RCW 71.05.150. On April 20, 1977, pursuant to RCW 71.05.180, Knox was admitted to Western State Hospital to be involuntarily detained for not more than 72 hours.

While at Western State Hospital, Knox was treated by Dr. Alva Miller, Clinical Director of the institution. Although Dr. Miller learned that Knox was on probation as a result of a burglary conviction, he apparently was unaware of the terms of probation. Dr. Miller also learned Knox had an extensive history of drug abuse, including the frequent use of the drug "angel dust" during the previous year. In fact, Knox told Dr. Miller he had taken angel dust just prior to the incident in which he emasculated himself.

As a result of his observation, Dr. Miller diagnosed Knox as having a "schizophrenic reaction, paranoid type with depressive features." Dr. Miller testified that his opinion at the time was that the "schizophrenic symptomatology was due primarily to the use of angel dust." Consequently, Dr. Miller prescribed Navane, an antipsychotic medication, for Knox.

On April 22, 1977, Dr. Miller and Betty Suttle, a psychiatric nurse, filed a petition in Pierce County Superior Court requesting authority to detain Knox for an additional period of up to 14 days. At a hearing on the petition, Dr. Miller and Nurse Suttle testified that, in their opinion, Knox was gravely disabled as a result of his drug abuse and presented a likelihood of serious harm to himself. They indicated to the court that further hospitalization at Western State was desirable and that Knox was not ready for less restrictive care. The Superior Court found Knox was gravely disabled and granted the petition for involuntary treatment.

Dr. Miller continued treatment and evaluation of Knox, including administration of the drug Navane. On May 8, 1977, just prior to his discharge, Knox was allowed to go home for Mother's Day but was required to return in the evening. That evening Knox was apprehended by hospital security personnel while driving his car on the hospital grounds in a reckless fashion that involved spinning his car in circles.

Nevertheless, Dr. Miller discharged Knox from the hospital the following morning. At the time, it was Dr. Miller's opinion Knox was not schizophrenic but that he had suffered a schizophrenic–like reaction from the angel dust he had taken. In Dr. Miller's opinion Knox had recovered from the drug reaction, was in full contact with reality, and was back to his usual type of personality and behavior.

Five days later, the accident occurred in which Cynthia Petersen was injured. As previously mentioned, Knox was under the influence of drugs at the time of the accident. It was later learned that Knox had flushed the Navane he received from Western State Hospital down a toilet.

Plaintiff brought this action against the State alleging it negligently treated Knox by failing to protect her from his dangerous propensities. Plaintiff argued that the failure of Dr. Miller to seek either additional confinement or to disclose information about Knox's parole violation was the proximate cause of her injuries. The jury agreed and rend-

ered a verdict in her favor.

The State raises a number of issues on appeal. (1) The psychiatrist had no duty to protect plaintiff from the dangerous propensities of a patient. (2) Even if the psychiatrist did have such a duty, the State is immune from liability for breach of the duty. (3) Plaintiff failed to present sufficient evidence that the actions of the psychiatrist were the proximate cause of plaintiff's injuries. (4) The trial court erred in submitting to the jury the question whether the psychiatrist acted with gross negligence in failing to petition the court for further confinement of Knox. (5) The trial court abused its discretion by allowing plaintiff to present evidence of Knox's subsequent criminal conduct and medical diagnosis and improperly refused an instruction limiting the use of evidence of Knox's subsequent criminal conduct. (6) The trial court incorrectly instructed the jury as to the liability of officers of the State when they act in good faith without gross negligence. (7) The trial court abused its discretion by allowing Superior Court Judge Soule to answer hypothetical questions posed by plaintiff.

Plaintiff raises an issue on cross appeal regarding the filing of a bond and the refusal of the trial court after plaintiff obtained her judgment to exonerate the bond which had been posted.

## I

The question as to whether the State has a duty to protect potential victims from the dangerous propensities of a state hospital patient is twofold. First, does a state hospital psychiatrist have a duty to seek additional confinement of a patient who remains potentially dangerous after initial hospitalization? Second, under the specific circumstances of this case, was Dr. Miller required, or even allowed, to disclose information about the violation by Knox of the conditions of his parole to the Superior Court or to Knox's probation officer?

## A

It is well settled that an essential element in any negli-

gence action is the existence of a legal duty which the defendant owes to the plaintiff. *See, e.g., Baerlein v. State,* 92 Wn.2d 229, 231, 595 P.2d 930 (1979); *Haslund v. Seattle,* 86 Wn.2d 607, 611 n.2, 547 P.2d 1221 (1976); *LaPlante v. State,* 85 Wn.2d 154, 159, 531 P.2d 299 (1975). Under the common law, a person had no duty to prevent a third party from causing physical injury to another. *Lipari v. Sears, Roebuck & Co.,* 497 F. Supp. 185, 188 (D. Neb. 1980); *Tarasoff v. Regents of Univ. of Cal.,* 17 Cal. 3d 425, 435, 551 P.2d 334, 131 Cal. Rptr. 14 (1976). *See generally* Harper & Kime, *The Duty to Control the Conduct of Another,* 43 Yale L.J. 886 (1934). A number of courts, however, have recognized an exception to this rule of nonliability where a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct. *See, e.g., Lipari v. Sears, Roebuck & Co., supra; Tarasoff v. Regents of Univ. of Cal., supra; Bradley Ctr., Inc. v. Wessner,* 161 Ga. App. 576, 287 S.E.2d 716 (1982); *McIntosh v. Milano,* 168 N.J. Super. 466, 403 A.2d 500 (1979). The Restatement (Second) of Torts reflects the general rule of nonliability and its exceptions:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315 (1965).

We have not yet considered whether a psychiatrist has a duty to protect against injuries caused by a patient. In *Kaiser v. Suburban Transp. Sys.,* 65 Wn.2d 461, 398 P.2d 14, 401 P.2d 350 (1965), we allowed a cause of action against a doctor favoring a third person who was injured by the doctor's patient where the doctor failed to warn his patient, a bus driver, of the side effects of a drug prescribed

for the treatment of a nasal condition. The plaintiff, a bus passenger, was injured when the driver lost consciousness and struck a telephone pole. We held that since the doctor should reasonably have foreseen the harm resulting from his failure to warn of the side effects of the drug the bus passenger was entitled to present evidence that the doctor's negligence was the proximate cause of her injuries.

The seminal case regarding the duty of a psychiatrist to protect against the conduct of a patient is *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976). In *Tarasoff* the plaintiffs alleged the defendant therapists had a duty to warn their daughter of the danger posed to her by one of the therapists' patients. The *Tarasoff* plaintiffs were parents of Tatiana Tarasoff, a young woman killed by a psychiatric patient. Two months prior to the killing, the patient informed his therapist that he intended to kill a young woman. Although the patient did not specifically name Tatiana as his intended victim, plaintiffs alleged, and the trial court agreed, that the defendant therapists could have readily identified the endangered person as Tatiana.

Applying Restatement (Second) of Torts § 315 (1965) to the facts before it, the *Tarasoff* court held the patient–therapist relationship was sufficient to support the imposition of an affirmative duty on the defendant for the benefit of third persons. *Tarasoff*, 17 Cal. 3d at 435. The *Tarasoff* court ruled that when a psychotherapist determines, or, pursuant to the standards of the profession, should determine, that a patient presents a serious danger of violence to another the therapist incurs an obligation to use reasonable care to protect the intended victim against such danger. *Tarasoff*, 17 Cal. 3d at 435. According to the *Tarasoff* court, discharge of the duty may require the therapist to take whatever steps are necessary under the circumstances, including possibly warning the intended victim or notifying law enforcement officials. *Tarasoff v. Regents of Univ. of Cal., supra.*

Although the *Tarasoff* decision did not emphasize the

identifiability of the victim, subsequent California decisions have limited the scope of the therapist's duty to readily identifiable victims. *See Thompson v. County of Alameda,* 27 Cal. 3d 741, 752–54, 614 P.2d 728, 167 Cal. Rptr. 70 (1980); *Mavroudis v. Superior Court,* 102 Cal. App. 3d 594, 600–01, 162 Cal. Rptr. 724 (1980). Other courts, however, have required only that the therapist reasonably foresee that the risk engendered by the patient's condition would endanger others. *See, e.g., Semler v. Psychiatric Inst.,* 538 F.2d 121, 124 (4th Cir.), *cert. denied,* 429 U.S. 827 (1976); *Lipari v. Sears, Roebuck & Co.,* 497 F. Supp. 185, 194 (D. Neb. 1980); *Williams v. United States,* 450 F. Supp. 1040, 1046 (D.S.D. 1978). In *Lipari,* for example, the court emphasized the importance of foreseeability in defining the scope of a person's duty to exercise due care. *See Lipari v. Sears, Roebuck & Co., supra.* In *Lipari* a psychiatric patient entered a nightclub and fired a shotgun into a crowded dining room causing injuries to plaintiff and killing her husband. The *Lipari* court found the defendant therapist had a duty to any person foreseeably endangered by the negligent treatment of the psychiatric patient. *Lipari v. Sears, Roebuck & Co., supra.*

In the present case, we follow the approach utilized in *Lipari v. Sears, Roebuck & Co., supra,* and *Kaiser v. Suburban Transp. Sys., supra.* Consequently, we conclude Dr. Miller incurred a duty to take reasonable precautions to protect anyone who might foreseeably be endangered by Larry Knox's drug–related mental problems. At trial Dr. Miller testified that Knox was a potentially dangerous person and that his behavior would be unpredictable. He also testified that if Knox used angel dust again he was likely to continue having delusions and hallucinations, especially if he quit taking the drug Navane. Dr. Miller testified he knew of Knox's reluctance to take Navane, and he thought it quite likely Knox would revert to using angel dust again. Nevertheless, Dr. Miller failed to petition the court for a 90–day commitment, as he could have done under RCW 71.05.280, or to take other reasonable precautions to protect

those who might foreseeably be endangered by Knox's drug–related mental problems.

## B

The privilege of communications between psychologist and patient is set forth in RCW 18.83.110, which provides:

Confidential communications between a client and a psychologist shall be privileged against compulsory disclosure to the same extent and subject to the same conditions as confidential communications between attorney and client.

The statute essentially provides the same protection to psychologist–patient communications as is provided by RCW 5.60.060 for communications between physician and patient. *Compare Department of Social & Health Servs. v. Latta,* 92 Wn.2d 812, 601 P.2d 520 (1979) (physician–patient privilege) *with In re Henderson,* 29 Wn. App. 748, 630 P.2d 944 (1981) (psychologist–patient privilege). Both statutes are procedural safeguards which derogate from common law and therefore are strictly construed. *See Latta,* 92 Wn.2d at 819; *In re Henderson,* 29 Wn. App. at 752. The application of either privilege requires a balancing of the benefits of the privilege against the public interest of a full revelation of all the facts. *See In re Henderson,* 29 Wn. App. at 753. *Accord, Dike v. Dike,* 75 Wn.2d 1, 11, 448 P.2d 490 (1968).

A different privilege applies to confidential communications when a person is subject to the procedures of Washington's involuntary commitment act, Laws of 1973, 1st Ex. Sess., ch. 142, § 29, p. 1028. The involuntary commitment act contains a "patient's bill of rights" which details those privileges guaranteed the detainee within the institutional setting. *See generally* Comment, *Progress in Involuntary Commitment,* 49 Wash. L. Rev. 617, 620–24 (1974); Survey of Washington Law, *Civil Commitment,* 9 Gonz. L. Rev. 260, 264 (1973). The act includes strict safeguards to ensure the confidentiality of records, files, and other information, subject to certain limited exceptions. Specifically, RCW

71.05.390 provided:

> The fact of admission and all information and records compiled, obtained, or maintained in the course of providing services to either voluntary or involuntary recipients of services at public or private agencies shall be confidential.
>
> Information and records may be disclosed only:
>
> . . .
>
> (5) To the courts as necessary to the administration of this chapter.
>
> (6) To law enforcement officers or public health officers necessary to carry out the responsibilities of their office: PROVIDED, THAT
>
> (a) Only the fact and date of admission, the fact and date of discharge, and the last known address shall be disclosed upon request; and
>
> (b) The law enforcement and public health officers shall be obligated to keep such information confidential in accordance with this chapter; and
>
> (c) Additional information shall be disclosed only after giving notice to said person and his counsel and upon a showing of clear, cogent and convincing evidence that such information is necessary and that appropriate safeguards for strict confidentiality are and will be maintained . . .

RCW 71.05.390, as amended, Laws of 1975, 1st Ex. Sess., ch. 199, § 10, p. 661 (superseded by Laws of 1979, 1st Ex. Sess., ch. 215, § 17, p. 1885).

The interplay between the psychologist–patient privilege of RCW 18.83.110 and the confidentiality provisions of the involuntary commitment act, RCW 71.05.390, is best demonstrated by comparing *Tarasoff v. Regents of Univ. of Cal.,* 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976) to this case. There the court examined provisions of California's Lanterman–Petris–Short Act, which governs the release of confidential information in connection with involuntary commitment proceedings. *Compare* Cal. Welf. & Inst. Code §§ 5328–5328.9 (West 1972) *with* RCW 71.05. The *Tarasoff* court found the confidentiality provisions of the Lanterman–Petris–Short Act inapplicable since involuntary commitment proceedings had not been instigated

against the psychiatric patient who killed Tatiana Tarasoff. *Tarasoff,* 17 Cal. 3d at 443.

In the present case, Dr. Miller was prohibited by statute from informing Knox's probation officer of the fact of his involuntary commitment at Western State Hospital. Dr. Miller could release information obtained during Knox's involuntary commitment only within the guidelines of RCW 71.05.390. RCW 71.05.390(6)(c) (now RCW 71.05-.390(7)(c)) allows release of information other than the mere facts of admission and discharge given the appropriate showing that disclosure is necessary. The statute prohibits, however, disclosure to anyone other than law enforcement personnel, who must request the information. RCW 71.05.390(6)(a) (now RCW 71.05.390(7)(a)). RCW 71.05 does not define the term "law enforcement" officers. RCW 43.101, however, distinguishes between "law enforcement personnel" and "correctional personnel":

> (4) The term "law enforcement personnel" means any public employee or volunteer having as a primary function the enforcement of criminal laws in general . . .
>
> (5) The term "correctional personnel" means any employee or volunteer who . . . has the responsibility for the confinement, care, management, training, treatment, education, supervision, or counseling of those individuals whose civil rights have been limited in some way by legal sanction.

RCW 43.101.010(4), (5).

Furthermore, Dr. Miller was prohibited from informing Judge Soule directly of the involuntary commitment of Knox at Western State. The hospital's records pertaining to Knox may be disclosed to the courts "as necessary to the administration of [RCW 71.05]." RCW 71.05.390(5) (now RCW 71.05.390(6)). The use of records pertaining to involuntary commitment "shall not be admissible as evidence in any legal proceeding outside this chapter". RCW 71.05.390. *Accord, State v. Batten,* 17 Wn. App. 428, 434, 563 P.2d 1287 (1977).

We agree with defendant that Dr. Miller was prohibited from disclosing information about the violation by Knox of

the conditions of his parole to the Superior Court or to Knox's probation officer. We disagree, however, that the jury was improperly instructed on the matter. The court's instruction 15 was essentially a recitation of RCW 71.05-.390. Furthermore, the court gave instruction 26, explaining:

> The law provides that communication between a patient and the doctor and his staff are confidential and should not be told to others to insure that the patient will disclose information to them so that he may receive proper treatment. The doctor and his staff may give out medical information or medical opinions regarding the patient, if the patient has given his permission. This law does not apply, however, to information about the patient obtained from any source or person other than the patient.

█ We conclude that the court's instructions properly informed the jury of the law of the case and allowed each side to argue its theory. We have repeatedly stated that it is not error to incorporate in an instruction the language of the controlling statute. *See, e.g., Wick v. Irwin,* 66 Wn.2d 9, 12–13, 400 P.2d 786 (1965); *Smith v. Rich,* 47 Wn.2d 178, 182, 286 P.2d 1034 (1955). *See also Day v. Goodwin,* 3 Wn. App. 940, 944, 478 P.2d 774 (1970). Taken as a whole, the court's instructions to the jury were adequate. *Brown v. Spokane Cy. Fire Protec. Dist. 1,* 100 Wn.2d 188, 668 P.2d 571 (1983); *State v. Theroff,* 95 Wn.2d 385, 389–90, 622 P.2d 1240 (1980).

## II

Having found that the State had a duty to take reasonable precautions to protect against the dangerous propensities of a state hospital patient, we must now determine whether the State is immune from liability for breach of the duty. In 1961 the Legislature adopted RCW 4.92.090. *See* Laws of 1961, ch. 136, § 1, p. 1680. The statute provides:

> The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for dam-

ages arising out of its tortious conduct to the same extent as if it were a private person or corporation.

■ RCW 4.92.090, by its terms, does not render the State liable for all official misconduct. *Haslund v. Seattle*, 86 Wn.2d 607, 617, 547 P.2d 1221 (1976); *King v. Seattle*, 84 Wn.2d 239, 243, 525 P.2d 228 (1974). According to the Washington courts, the statute does not affect the traditional distinction between discretionary policy decisions which enjoy statutory immunity and ministerial administrative acts which do not. *See, e.g., Haslund*, 86 Wn.2d at 617–19; *King*, 84 Wn.2d at 243–46; *Evangelical United Brethren Church v. State*, 67 Wn.2d 246, 253–55, 407 P.2d 440 (1965). Discretionary governmental immunity, however, is an extremely limited exception. *Haslund*, 86 Wn.2d at 619. In *Evangelical United Brethren Church v. State, supra*, we set forth four *preliminary* questions to assist in ascertaining whether an act was a discretionary governmental process and therefore nontortious, regardless of its lack of wisdom:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy . . . as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act . . . require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite . . . authority . . .? If these preliminary questions can be clearly and unequivocally answered in the affirmative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious, regardless of its unwisdom. If, however, one or more of the questions call for or suggest a negative answer, then further inquiry may well become necessary, depending upon the facts and circumstances involved.

*Evangelical United Brethren Church*, 67 Wn.2d at 255, *quoted in Haslund*, 86 Wn.2d at 618. The *Evangelical*

*United* test was further refined in *King v. Seattle, supra,* where we emphasized:

> Immunity for "discretionary" activities serves no purpose except to assure that courts refuse to pass judgment on policy decisions in the province of coordinate branches of government. Accordingly, to be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision.

*King,* 84 Wn.2d at 246, *quoted in Haslund v. Seattle,* 86 Wn.2d at 618.

The Washington courts have not yet determined whether a psychiatrist employed by the State is engaged in discretionary activity when treating patients at a state mental hospital. In *Tarasoff v. Regents of Univ. of Cal.,* 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976), the California Supreme Court concluded that the scope of discretionary immunity "should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions." 17 Cal. 3d at 445. Therefore, the *Tarasoff* court ruled that therapists employed by the State of California "are not immune from liability for their failure to warn of Tatiana's peril." 17 Cal. 3d at 445. Similarly, in *Lipari v. Sears, Roebuck & Co.,* 497 F. Supp. 185 (D. Neb. 1980), the court rejected the government's contention that negligent implementation of the Veterans Administration's policy on detention of potentially dangerous patients fell within the discretionary function exception to the Federal Tort Claims Act. *Lipari,* 497 F. Supp. at 195. The *Lipari* court held that the implementation as opposed to the development of an agency's rules and regulations does not involve policy judgments within the discretionary function exception. *Lipari v. Sears, Roebuck & Co., supra.* The *Lipari* court reasoned that the therapist's decision to detain a patient, although requiring professional expert evaluation, did not involve a balancing of policy considerations and was thus not a dis-

cretionary function. *Lipari v. Sears, Roebuck & Co., supra.*

■ Dr. Miller's decision not to seek an additional 90–day involuntary commitment of Knox did not fall within the discretionary function exception from liability. The decision not to seek further detention of Knox was presumably based on the psychiatrist's professional judgment that Knox's condition did not necessitate further detention. This decision is not different in kind from the decision which any therapist in private practice would have had to make in similar circumstances. Thus, the judgment of Dr. Miller can be readily assessed by use of the tort standard applicable to professional negligence. In applying the standard, the court would not be reviewing a "decision necessarily involving a basic governmental policy, program, or objective" but would be only assessing the reasonableness of Dr. Miller's evaluation of Knox.

## III

Next we must determine whether plaintiff presented sufficient evidence that the actions of Dr. Miller were the proximate cause of her injuries. In order to prove actionable negligence, a plaintiff must be able to establish "(1) the existence of a duty owed to the complaining party, (2) a breach thereof, and (3) a resulting injury." *LaPlante v. State,* 85 Wn.2d 154, 159, 531 P.2d 299 (1975); *Rosendahl v. Lesourd Methodist Church,* 68 Wn.2d 180, 182, 412 P.2d 109 (1966). For legal responsibility to attach to the negligent conduct, the claim of breach of duty must be a proximate cause of the resulting injury. *LaPlante v. State, supra; Pratt v. Thomas,* 80 Wn.2d 117, 119, 491 P.2d 1285 (1971). A finding of proximate cause is premised upon proof of cause in fact as well as a legal determination that liability should exist. *Bernethy v. Walt Failor's, Inc.,* 97 Wn.2d 929, 935, 653 P.2d 280 (1982). *See King v. Seattle,* 84 Wn.2d 239, 248–49, 525 P.2d 228 (1974).

■ The term "proximate cause" means a cause which in a direct sequence, unbroken by any new independent cause, produces the injury complained of and without which the

injury would not have happened. *Bernethy v. Walt Failor's, Inc., supra. See King v. Seattle,* 84 Wn.2d at 249 n.2. We have consistently held that

the question of proximate cause is for the jury, and it is only when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion that it may be a question of law for the court.

*Mathers v. Stephens,* 22 Wn.2d 364, 370, 156 P.2d 227 (1945), *quoted in Bernethy,* 97 Wn.2d at 935. *Accord, Bordynoski v. Bergner,* 97 Wn.2d 335, 341, 644 P.2d 1173 (1982).

Here, plaintiff presented sufficient evidence to allow submission of the question of proximate cause to the jury. As the briefs amply demonstrate, the facts of the case are disputed and the inferences to be drawn from them may vary. Furthermore, unlike in *Walters v. Hampton,* 14 Wn. App. 548, 543 P.2d 648 (1975), a case relied on by the State, there are not in this case "too many gaps in the chain of factual causation to warrant submission of that issue to the fact finder." *Walters,* 14 Wn. App. at 555. The trial court did not err by submitting the issue of proximate cause of plaintiff's injuries to the jury.

IV

The next question is whether plaintiff presented sufficient evidence that the failure of Western State Hospital to protect her from the dangerous propensities of its patient constitutes gross negligence. The State asserts that plaintiff failed to establish a standard of care applicable to Dr. Miller's conduct, the violation of which would give rise to plaintiff's claim. It also claims that the testimony of other psychiatrists must be presented to establish what standard of care the professional community would require. Plaintiff counters that expert testimony would be needed only when the issue is whether the therapist "should have known" of a patient's dangerous propensities, according to the standards of the profession. Plaintiff argues that expert testimony is

not required when the issue is whether the therapist had actual knowledge of a patient's dangerousness.

■ As a general proposition, expert testimony is not required to establish a standard of care in an action for negligence. 2 F. Harper & F. James, *Torts* § 17.1 (1956). Only in a professional malpractice action must a plaintiff introduce expert testimony *to* establish the standard of care by which the defendant's conduct must be measured. *See Stafford v. Hunter,* 66 Wn.2d 269, 270, 401 P.2d 986 (1965); *Teig v. St. John's Hosp.,* 63 Wn.2d 369, 375, 387 P.2d 527 (1963). Even in a professional malpractice case, however, expert testimony is not required if the practice of a professional is such a gross deviation from ordinary care that a lay person could easily recognize it. *Stafford v. Hunter, supra; Teig v. St. John's Hosp., supra;* F. Harper & F. James, *supra. Cf. Conrad v. Lakewood Gen. Hosp.,* 67 Wn.2d 934, 410 P.2d 785, 10 A.L.R.3d 1 (1966) (hemostat left in patient in the course of surgery). Furthermore, once the applicable standard of care is established, further expert testimony is not required to prove a breach of that standard. *See Douglas v. Bussabarger,* 73 Wn.2d 476, 438 P.2d 829 (1968). *See generally* Survey of Washington Law, *Physicians and Surgeons,* 15 Gonz. L. Rev. 931, 936 (1980); 51 Wash. L. Rev. 167, 172–73 (1975).

In *Tarasoff v. Regents of Univ. of Cal.,* 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976), the California court rejected the notion that the adequacy of the therapist's conduct must be measured against a professional malpractice standard rather than "the traditional negligence standard of the rendition of reasonable care under the circumstances." *Tarasoff,* 17 Cal. 3d at 439. As some commentators suggest,

the appropriate standard for disclosure is a lay standard rather than a professional one. Furthermore, the standard and compliance with it should be determined by judge and jury, not by the professional practice of psychotherapists as evidenced by expert opinion. The reason for the familiar contrary rule in adjudging physicians is

not that medical problems call for peculiarly delicate balancing between countervailing risks, or that physicians deserve a great deal of discretion beyond the range of judicial scrutiny. Rather, the lay person is not credited with sufficient knowledge to pass an informed judgment about clinical matters. . . .

In psychotherapy, too, expert testimony on such questions as diagnosis relating to the imminence of danger obviously demands respect, but the ultimate question of resolving the tension between the conflicting interests of patient and potential victim is one of social policy, not professional expertise. We may sympathize with the therapist confronted with a decision at once delicate and awesome, but this is hardly unique nor sufficient for a claim to immunity. In sum, the therapist owes a legal duty not only to his patient, but also to his patient's would–be victim, and is subject in both respects to scrutiny by judge and jury.

(Footnote omitted.) Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma,* 62 Calif. L. Rev. 1025, 1066–67 (1974). *See generally* Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,* 62 Calif. L. Rev. 693, 734–43 (1974).

Plaintiff presented sufficient evidence of gross negligence on the part of Dr. Miller.

## V

At trial plaintiff introduced evidence of acts committed by Knox subsequent to the accident in which plaintiff was injured. On December 6, 1977, Knox killed Mr. and Mrs. Hibberd and raped their daughter. Plaintiff also offered testimony from three psychiatrists who treated Knox after the accident with plaintiff occurred. Dr. Hugo Van Dooren, chairman of the psychiatric program at Puget Sound Hospital, testified that on approximately May 18, 1977, he diagnosed Knox as suffering from schizophrenia, catatonic type. Dr. Robert Anderson, a psychiatrist at Fairfax Hospital, testified that in August 1977 he diagnosed Knox's condition as schizophrenic, undifferentiated type, chronic and severe. Dr. Thomas Petek of the Greater Lakes Mental Health Center, who treated Knox from October 1975 to

January 1977 and who examined Knox on February 3, 1978, testified that, in his opinion, Knox suffered from schizophrenia, paranoid type, with depressive features, continually since before the date he emasculated himself, including the date he killed Mr. and Mrs. Hibberd and raped their daughter.

■ The admission or refusal of relevant evidence lies largely within the discretion of the trial court. *Maehren v. Seattle,* 92 Wn.2d 480, 488, 599 P.2d 1255 (1979), *cert. denied,* 452 U.S. 938 (1981). "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. ER 401. Evidence of subsequent conduct is inadmissible only when it has no probative value on the issues before the court. *Golden Gate Hop Ranch, Inc. v. Velsicol Chem. Corp.,* 66 Wn.2d 469, 475, 403 P.2d 351 (1965), *cert. denied,* 382 U.S. 1025 (1966). Evidence of subsequent conduct is admissible in a negligence action for the purpose of showing the conditions at the time of the injury. *See Peterson v. King Cy.,* 41 Wn.2d 907, 910, 252 P.2d 797 (1953).

In the present case, Dr. Miller testified that, in his opinion, Knox had fully recovered from his schizophrenic mental condition at the time of his discharge from Western State Hospital. The testimony of Drs. Van Dooren, Anderson, and Petek was offered to rebut Dr. Miller's testimony. The evidence of Knox's subsequent criminal conduct and medical diagnosis was admissible for that purpose.

The State argues the Superior Court improperly refused its proposed instruction limiting the use of evidence of Knox's subsequent criminal conduct. The State proposed two instructions limiting the use of this evidence. The trial court refused both of the State's proposed limiting instructions. The State's proposed instruction 5 provided:

In determining whether or not the defendant was guilty of gross negligence, you are instructed that a party is entitled to have this issue determined by the facts and

circumstances as they appeared at the time of the occurrence and not by what the facts and circumstances may appear to have been subsequent to the time of the occurrence. In other words, in determining whether or not a party was guilty of gross negligence, the party is entitled to have his conduct in that regard judged by the standards of care laid down in these instructions and the facts and circumstances as they existed then, and the conduct should not be judged by you by using hindsight.

The State's proposed instruction 14 provided:

You are instructed that evidence of events or circumstances that took place after the accident of May 14, 1977, are not to be considered by you in determining whether the agents of the defendant were negligent or grossly negligent.

Jury instructions should be read as a whole to determine their sufficiency. *State v. Foster*, 91 Wn.2d 466, 480, 589 P.2d 789 (1979). *See State v. Dana*, 73 Wn.2d 533, 537, 439 P.2d 403 (1968); *Roberts v. Goerig*, 68 Wn.2d 442, 455, 413 P.2d 626 (1966). Taken together, jury instructions are sufficient if they are readily understood and not misleading to the ordinary mind and permit a party to satisfactorily argue his or her theory of the case to the jury. *State v. Foster, supra; State v. Dana, supra; State v. Long*, 19 Wn. App. 900, 902, 578 P.2d 871 (1978). The number and specific language of the instructions are matters left to the trial court's discretion. *State v. Long, supra; Levea v. G.A. Gray Corp.*, 17 Wn. App. 214, 224–25, 562 P.2d 1276 (1977).

■ In the present case, the instructions given allowed the State to present its theory of the case that Knox reasonably appeared to Dr. Miller to have recovered from his schizophrenic mental condition. Furthermore, since evidence of Knox's subsequent conduct was admissible to rebut Dr. Miller's testimony, the State's proposed instructions would have been an erroneous statement of the law. It is not error for a trial court to refuse an instruction which is not a correct statement of the law. *Mieske v. Bartell Drug Co.*, 92 Wn.2d 40, 46, 593 P.2d 1308, 6 A.L.R.4th 923

(1979). *See Rickert v. Geppert,* 72 Wn.2d 1040, 432 P.2d 645 (1967).

## VI

The State contends the trial court incorrectly instructed the jury regarding the liability of agents of the State for negligence in connection with involuntary commitment under RCW 71.05. Instruction 27, regarding the liability of agents of the State, stated:

> The laws of the State of Washington provide that no officer of a public or private agency, nor the superintendent, professional person in charge, his professional designee, or attending staff of any such agency, nor any public official performing functions necessary to the administration of mental commitment laws, nor peace officer responsible for detaining a person pursuant to mental commitment laws shall be civilly or criminally liable for detaining or releasing a person pursuant to mental commitment laws at or before the end of the period for which he was admitted or committed for evaluation or treatment: *Provided, that such duties were performed in good faith and without gross negligence.*

(Italics ours.) The State argues the inclusion of the term "good faith" in instruction 27 provided a false issue for the jury and an alternative ground of liability which was not pleaded and which was not supported by any evidence.

A trial court has considerable discretion as to how instructions will be worded. *Kjellman v. Richards,* 82 Wn.2d 766, 768, 514 P.2d 134 (1973); *Levea v. G.A. Gray Corp.,* 17 Wn. App. at 224–25. The court does not abuse its discretion when the instructions, read as a whole, properly inform the trier of fact on the applicable law. *State v. Dana,* 73 Wn.2d 533, 537, 439 P.2d 403 (1968); *Levea v. G.A. Gray Corp., supra.* Instruction 27 is a recitation of RCW 71.05.120 (amended, effective September 1, 1979). The statute sets forth the applicable law regarding the liability of state officers for negligent implementation of Washington's involuntary commitment act, RCW 71.05. The trial court did not abuse its discretion by presenting RCW 71.05.120 to the jury in the form of an instruction.

## VII

Finally, the State argues that the trial court improperly allowed former Superior Court Judge Hardyn B. Soule to respond to hypothetical questions posed by plaintiff's counsel. At trial, plaintiff called Judge Soule as a witness to help show that Knox would have been confined on the day of the accident if Western State Hospital had contacted his probation officer. Plaintiff's counsel posed a hypothetical question assuming a number of facts previously presented as evidence and asked whether, assuming those facts, Judge Soule would have ordered a probation revocation hearing. The State contends that the trial court incorrectly allowed Judge Soule to respond to the hypothetical question. The State argues that the hypothetical question was based on mere speculation since a number of facts assumed in the hypothetical would have been inadmissible in a parole revocation hearing.

■ Hypothetical questions must be reasonably based on material facts established by the record. *See, e.g., Curtiss v. YMCA,* 82 Wn.2d 455, 466, 511 P.2d 991 (1973); *Mercer v. Department of Labor & Indus.,* 74 Wn.2d 96, 99, 442 P.2d 1000 (1968); *Smith v. American Mail Line, Ltd.,* 58 Wn.2d 361, 368, 363 P.2d 133 (1961). The trial judge has wide discretion to control and supervise the propounding of hypothetical questions. *See, e.g., Glazer v. Adams,* 64 Wn.2d 144, 150, 391 P.2d 195 (1964); *Helman v. Sacred Heart Hosp.,* 62 Wn.2d 136, 151, 381 P.2d 605, 96 A.L.R.2d 1193 (1963); *Smith v. American Mail Line, Ltd., supra.* A trial court does not abuse its discretion by allowing a party to propose a hypothetical question based solely on that party's theory of the case or to include disputed facts. *Spinelli v. Economy Stations, Inc.,* 71 Wn.2d 503, 508–09, 429 P.2d 240 (1967); *Levea v. G.A. Gray Corp.,* 17 Wn. App. 214, 221, 562 P.2d 1276 (1977). *See Kuster v. Gould Nat'l Batteries,* 71 Wn.2d 474, 482–83, 429 P.2d 220 (1967). An erroneous assumption of a material fact destroys the probative value of a hypothetical question. *McGuire v. United Bhd. of Carpenters, Local 470,* 50 Wn.2d 699, 711, 314 P.2d 439

(1957); *Arthurs v. National Postal Transp. Ass'n,* 49 Wn.2d 570, 578, 304 P.2d 685 (1956). To necessitate exclusion of the witness' answer, however, the erroneous assumption must be of a material fact. *Arthurs v. National Postal Transp. Ass'n, supra.*

The trial court did not abuse its discretion by allowing Judge Soule to respond to the hypothetical question. One of the assumptions made by Judge Soule was that Dr. Miller would testify at the hypothetical parole revocation hearing. Judge Soule specifically stated, however, that he would not require Dr. Miller to testify at the hearing if it could be shown that the doctor–patient privilege precluded his testimony. Furthermore, the question was not whether Judge Soule would have revoked Knox's parole; rather, the question was, given the circumstances of the hypothetical, whether a hearing would be held. The testimony of Dr. Miller would not be crucial to the determination by Judge Soule whether to hold a parole revocation hearing. Therefore, the admissibility of Dr. Miller's testimony at the hearing was not a material fact necessary to the validity of the hypothetical question.

## VIII

RCW 4.92.010 requires any person having a claim against the State to post a cost bond. Specifically, the statute requires:

> Any person or corporation having any claim against the state of Washington . . . shall, at the time of filing his complaint, file a surety bond . . . to the effect that such plaintiff will indemnify the state against all costs that may accrue in such action . . . in case the plaintiff shall fail to prosecute his action or to obtain a judgment against the state . . .

Pursuant to RCW 4.92.010, plaintiff filed a bond with the Clerk of the Pierce County Superior Court. After plaintiff obtained her judgment, however, the Superior Court refused to exonerate the bond. On cross appeal plaintiff asserts the trial court erred in requiring her to post a bond pursuant to RCW 4.92.010 and in refusing to exonerate the

bond after judgment was obtained. Plaintiff claims that RCW 4.92.010 violates the equal protection clauses of U.S. Const. amend. 14 and Const. art. 1, § 12.

U.S. Const. amend. 14, § 1 provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." Similarly, Const. art. 1, § 12 provides:

> No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

The requirements of the special "privileges or immunities" prohibition of Const. art. 1, § 12 are in most cases at least as stringent as those of the federal equal protection clause. *Hunter v. North Mason High Sch.,* 85 Wn.2d 810, 819 n.9, 539 P.2d 845 (1975). Ordinarily, inconsistency with one necessarily implies inconsistency with the other. *Hunter v. North Mason High Sch., supra; State v. Perrigoue,* 81 Wn.2d 640, 503 P.2d 1063 (1972).

The principle of equal protection "'does not require that things different in fact be treated in law as though they were the same". *Jenkins v. State,* 85 Wn.2d 883, 888, 540 P.2d 1363 (1975) (quoting Tussman & tenBroek, *The Equal Protection of the Laws,* 37 Calif. L. Rev. 341, 344 (1949)). The equal protection principle does require, however, "in its concern for equality, that those who are similarly situated be similarly treated.'" *Jenkins,* 85 Wn.2d at 888 (quoting Tussman & tenBroek, 37 Calif. L. Rev. at 344). If a statute creates an inherently suspect classification such as one based on race, nationality, or alienage, the statute, when challenged, will be subjected to strict scrutiny. *Graham v. Richardson,* 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971); *Nielsen v. Washington State Bar Ass'n,* 90 Wn.2d 818, 820, 585 P.2d 1191 (1978). A statute which does not affect fundamental rights or create a suspect classification, however, is generally subjected to minimal judicial scrutiny and will not be invalidated unless it rests on grounds wholly irrelevant to the achievement of a legitimate state objective. *McGowan v. Maryland,* 366 U.S. 420,

425–26, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961); *Nielsen v. Washington State Bar Ass'n, supra.*

Under the "minimum scrutiny" approach, the reviewing court must determine (1) whether the legislation applies alike to all members within the designated class; (2) whether there are reasonable grounds to distinguish between those within and those without the class; and (3) whether the classification has a rational relationship to the purpose of the legislation. *Yakima Cy. Deputy Sheriff's Ass'n v. Board of Comm'rs,* 92 Wn.2d 831, 835–36, 601 P.2d 936 (1979), *appeal dismissed,* 446 U.S. 979 (1980). Under the minimum scrutiny analysis, a challenged statute is presumed constitutional and the party challenging it has a heavy burden of showing there is no reasonable basis for the classification or the classification is contrary to the purpose of the legislation. *Yakima Cy. Deputy Sheriff's Ass'n,* 92 Wn.2d at 836.

The question of the constitutionality of RCW 4.92.010 was specifically addressed in *Sheffield v. State,* 92 Wn.2d 807, 601 P.2d 163 (1979). In *Sheffield,* plaintiffs sought damages for negligent administration of the State's foster home program. Shortly after the action was filed, plaintiffs moved to waive the cost bond required by RCW 4.92.010. The Superior Court denied plaintiffs' motion. The Supreme Court granted discretionary review and reversed the trial court's requirement that plaintiffs file a cost bond.

In a plurality opinion the *Sheffield* court held that RCW 4.92.010 violated the equal protection clause. *Sheffield,* 92 Wn.2d at 808–09. The plurality quoted with approval from *Hunter v. North Mason High Sch.,* 85 Wn.2d 810, 539 P.2d 845 (1975), where the court held:

Any policy of placing roadblocks in the way of potential claimants against the state having been abandoned, we cannot uphold nonclaim statutes simply because they serve to protect the public treasury. Absent that justification, there is no basis, substantial or even rational, on which their discrimination between governmental plaintiffs and others can be supported. They thus cannot stand under the equal protection clause of the Four-

teenth Amendment or Const. art. 1, § 12. We follow a growing number of courts in holding that the arbitrary burden placed on state claimants by this type of statute cannot withstand constitutional scrutiny.

(Footnotes and citations omitted.) *Hunter*, 85 Wn.2d at 818–19, *quoted in Sheffield*, 92 Wn.2d at 808. The plurality concluded that the analysis and reasoning in *Hunter* as it applied to RCW 4.96.020 applies with equal force to RCW 4.92.010.

We adopt the plurality's opinion in *Sheffield* and hold that RCW 4.92.010 violates the equal protection guaranties of U.S. Const. amend. 14 and Const. art. 1, § 12. There is no justification for a statute which requires cost bonds from litigants against the State but not from litigants against private parties.

We affirm the judgment of the Pierce County Superior Court on the verdict for plaintiff of $250,000. We reverse the trial court's decision, however, insofar as plaintiff was required to post a bond for costs pursuant to RCW 4.92-.010. We remand the case to the Superior Court with instructions to exonerate the bond.

Affirmed in part, reversed and remanded in part.

WILLIAMS, C.J., ROSELLINI, UTTER, BRACHTENBACH, DORE, and PEARSON, JJ., and HAMILTON, J. Pro Tem., concur.

DIMMICK, J., concurs in the result.

Reconsideration denied December 13, 1983.

[No. 48610-7. En Banc. October 20, 1983.]