# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SCOTT ANDERSON TRUCKING, INC., a Utah corporation, | ) ) ) | DIVISION ONE |
| Appellant, | ) ) | No. 70019-7-I |
| v. | ) ) | UNPUBLISHED OPINION |
| PACCAR FINANCIAL CORP., a Washington corporation, | ) ) ) ) | |
| Respondent. | ) ) | FILED: May 19, 2014 |

DWYER, J. — Glenn Davis was hired by Scott Anderson Trucking, Inc. (SATI) to work as a "subhauler" on a construction project. Although Davis had use of a tractor, he owed a significant amount of money on the tractor to Paccar Financial Corporation. When Davis fell behind on his monthly loan payments, SATI began to make payments to Paccar on Davis's behalf and eventually paid off the loan balance in exchange for the tractor's certificate of title. Subsequently, Davis—masquerading as Scott Anderson—telephoned Paccar, claimed that he had lost the title, and requested a lien release. After obtaining the lien release, Davis received a title to the tractor, free and clear of liens, from the Nevada Department of Motor Vehicles (DMV). Davis then absconded with the tractor.

Although it recovered the tractor, SATI sued Paccar, alleging theories of

negligence and breach of contract. The trial court granted summary judgment in favor of Paccar and SATI appealed. SATI argues on appeal that a special relationship existed between it and Paccar, which gave rise to a duty of care that Paccar breached by providing Davis with a lien release. Further, SATI avers that it formed a contract with Paccar by its conduct, which contract Paccar breached. Finally, SATI asserts that the existence of issues of material fact render the trial court's ruling improper. We hold that Paccar did not owe SATI a duty of care in tort, that no contractual relationship existed between Paccar and SATI, and that no genuine issues of material fact exist. Accordingly, we affirm.

I

SATI is a trucking company based in Salt Lake City, Utah. Scott Anderson is SATI's president, sole principal, and CR 30(b)(6) witness.

Paccar is a Washington corporation which operates as a financial institution providing financing to the trucking industry. Paccar's principal place of business is in Washington, but it also has offices in Texas.

Glenn Davis, who is not a party to this case, was hired by SATI as a "subhauler" on a multi-year road construction project in Salt Lake City. The contract entered into between SATI and Davis is known in the trucking industry as a "lease," with the owner-operator (Davis) referred to as the "lessor," and the motor carrier (SATI) as the lessee. Thus, Davis "leased" to SATI his 2004 Kenworth tractor and his driving services between 2007 and 2009.

To obtain his tractor, Davis signed a security agreement retail installment contract (the Security Agreement) with Rush Truck Centers of Texas. In

- 2 -

exchange for the tractor, Davis agreed to pay monthly installments in the amount of $2,243.01 for 54 months. Davis agreed that Rush could assign the Security Agreement to Paccar, which it did on January 29, 2006.

Davis fell behind on his monthly payments to Paccar. He consistently made payments late and, on occasion, had to pay two monthly installments together. In late 2006, Paccar contacted SATI and threatened to foreclose on Davis's loan and repossess the truck unless it received timely payments on the truck loan. Knowing of the lease agreement between Davis and SATI, Paccar suggested that SATI could avoid losing the services of Davis and his tractor were it to make his loan payments. SATI ultimately agreed to make payments to Paccar on Davis's behalf. In January 2007, SATI began making payments on Davis's loan, but did so by making each payment 60 days after the monthly due dates. By waiting 60 days, SATI could refuse to make a payment and empower Paccar to foreclose immediately, if necessary. Although Paccar initially protested this method of payment, it ultimately agreed to accept performance pursuant to this arrangement. SATI made payments in this manner for nearly three years.

Paccar also learned that the insurance Davis had declared on the tractor, which was a requirement under Paccar's loan documentation, was invalid for nonpayment of premiums. At Paccar's request, SATI began making payments to Davis's insurer so that coverage would be reinstated. Later, SATI procured insurance coverage on the tractor through its own insurer.

By September 2009, the relationship between Anderson and Davis had deteriorated and Anderson was no longer comfortable proceeding without SATI

holding a lien on the tractor and physical possession of the title. Davis owed SATI a significant debt and Anderson was concerned that Davis might abscond with the tractor. On October 8, 2009, Anderson telephoned Lisa Robison, a Paccar employee charged with collections on Davis's account, and requested a "payoff" amount so that he could obtain the title of the tractor on behalf of SATI. Robison replied that Anderson needed to obtain Davis's signature to authorize the payoff. Davis provided Paccar with a written request and authorization to release the loan payoff information on his loan to SATI. After receiving the authorization from Davis, Paccar faxed the loan payoff information to Davis. Thereafter, SATI paid the loan balance to Paccar.

In early December, Paccar mailed the tractor's certificate of title to SATI. Anderson, who dealt with vehicle titles quite often and understood that the title had to be recorded in order to perfect his interest in the tractor, nevertheless did not immediately record the title. Anderson's reason for not immediately perfecting his interest was that he had a business trip planned in February to Las Vegas, around two months from when he received the certificate of title, and that he intended to visit the Nevada DMV and record the title in person.

On January 7, 2010, Davis called Paccar employee Kimberly Slater, told her that he was Anderson, told her that he had lost the title that Paccar had earlier sent to him, and requested a lien release certification so that he could obtain a duplicate title clear of any lien notations. Slater stated that these types of phone calls are common and that it is her regular practice, as well as the regular practice at Paccar, to ask the caller for some type of identifying

- 4 -

information before sending such a lien release. Although Slater did not recall the specifics of her conversation with Davis, she had no reason to believe that she did not follow her regular practice of asking for identifying information, adding that she would not have sent the release had she not been satisfied that she was speaking with Anderson. Slater received a faxed lien release form from the Nevada DMV that was partially filled out. She presented this to her supervisor, Karen Raney, for her signature. Raney signed the release and Slater faxed it back to the Nevada DMV. Davis then presented the lien release to the Nevada DMV and was issued a new title for the tractor.

On March 5, Slater sent to fellow Paccar employee Lori Brohard an e-mail, which was forwarded to Anderson, wherein she wrote,

> A person stating they were Scott Anderson called in on the 7th [January 7, 2010] stating we would be getting a DMV form faxed over, and could we please sign and fax back to him. "Scott" stated he had lost his title; I didn't question this . . . we get calls like this daily! We received the form, Raney and I both signed it and I faxed it back to him. According to Joel with the Vegas DMV (702-486-4368) stated that Glenn Davis walked into the DMV on the 8th with the lien release and was given a duplicate lien free title right then.

Just as Anderson had feared, Davis absconded with the truck.

Raney, who had worked in the office where Davis's loan was serviced for almost 40 years, had never seen another case of lien-release fraud. She was unaware of any other case of lien-release fraud anywhere at Paccar.

SATI subsequently recovered the truck, obtaining both title and possession. Nevertheless, SATI filed suit against Paccar in January 2012 in King County Superior Court, alleging theories of negligence and breach of

contract. Paccar moved for summary judgment on February 1, 2013. On March 1, the trial court summarily granted summary judgment in Paccar's favor.

SATI appeals.

II

SATI contends that the trial court erred by granting summary judgment as to its negligence cause of action. This is so, it asserts, because Paccar owed SATI a duty of care that it breached when it sent Davis the lien release, thereby proximately causing harm to SATI. We disagree.

"This court reviews summary judgments de novo." Adams v. City of Seattle, 173 Wn. App. 398, 402, 294 P.3d 774 (2013). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The moving party has the burden "'to demonstrate that there is no genuine dispute as to any material fact and all reasonable inferences from the evidence must be resolved against him.'" Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 349, 588 P.2d 1346 (1979) (quoting Morris v. McNicol, 83 Wn.2d 491, 494, 519 P.2d 7 (1974)). "The existence of a legal duty is generally a question of law. But where duty depends on proof of certain facts that may be disputed, summary judgment is inappropriate." Sjogren v. Props. of the Pac. Nw., LLC, 118 Wn. App. 144, 148, 75 P.3d 592 (2003).

SATI contends that Paccar owed it a duty of care in tort. SATI argues that application of Texas law, rather than Washington law, gives rise to a duty of care. It is proper for us to apply Texas law, SATI asserts, because the parties agree

that Texas law applies and because all of Paccar's wrongdoing took place in Texas. Although Paccar's alleged wrongdoing did take place in Texas, the parties do not agree that Texas law applies. Given that the parties dispute which state's law applies, we must determine whether an actual conflict between the laws of the two states exists before engaging in a conflict of laws analysis.

> "'When parties dispute choice of law, there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before Washington courts will engage in a conflict of laws analysis.'" [Erwin v. Cotter Health Ctrs., Inc., 161 Wn.2d 676, 692, 167 P.3d 1112 (2007) (quoting Seizer v. Sessions, 132 Wn.2d 642, 648, 940 P.2d 261 (1997)).] "If the result for a particular issue 'is different under the law of the two states, there is a 'real' conflict.'" [Erwin, 161 Wn.2d at 692 (quoting Seizer, 132 Wn.2d at 648).] Where the laws or interests of the concerned states do not conflict, "the situation presents 'a "false" conflict' and 'the presumptive local law is applied.'" [Erwin, 161 Wn.2d at 692 (quoting Seizer, 132 Wn.2d at 648-49).]

Freestone Capital Partners LP v. MKA Real Estate Opportunity Fund I, LLC, 155 Wn. App. 643, 664, 230 P.3d 625 (2010).

SATI directs our attention to one potential conflict: namely, that Washington requires a "special relationship" as a prerequisite of tort liability for a third party's criminal misconduct, whereas Texas does not require a "special relationship." SATI is correct that Washington and Texas take divergent approaches regarding the import of a "special relationship." However, whether the *result* of—not merely the approach to—a particular issue is different determines whether there is a real conflict. Therefore, we must determine whether the divergent approaches taken by Washington and Texas also lead to divergent results.

In Washington, "an actor ordinarily owes no duty to protect an injured party from harm caused by the criminal acts of third parties." Parrilla v. King County, 138 Wn. App. 427, 436, 157 P.3d 879 (2007). "Washington cases finding the existence of a duty to guard against the criminal conduct of a third party have generally," justified it "based on the existence of a 'special relationship' between either the actor and the victim, or between the actor and the criminal third party." Parrilla, 138 Wn. App. at 436-37; see also Nivens v. 7-11 Hoagy's Corner, 133 Wn.2d 192, 202 n.2, 943 P.2d 286 (1997) (recognized special relationships include common carriers and passengers, innkeepers and guests, landowners and members of the public they hold their land open to, and a custodian and his ward (citing RESTATEMENT (SECOND) OF TORTS § 314(A) (1965))). Nevertheless, even where a special relationship exists, a duty to protect against third party criminal acts arises only if the harm is foreseeable. Nivens, 133 Wn.2d at 205 ("Our recognition of a duty does not end the present inquiry, however. No duty arises unless the harm to the invitee by third persons is foreseeable."). Although previous cases required the existence of a special relationship, in Parrilla, we held that a duty to guard against the criminal conduct of a third party nevertheless arose in a situation where no special relationship existed: "a duty to guard against a third party's foreseeable criminal conduct exists where an actor's own affirmative act has created or exposed another to a recognizable high degree of risk of harm through such misconduct, which a reasonable person would have taken into account." 138 Wn. App. at 439 (citing RESTATEMENT (SECOND) OF TORTS § 302 B (1965); Tae Kim v. Budget Rent A Car

Sys., Inc., 143 Wn.2d 190, 15 P.3d 1283 (2001)).

In Texas, as in Washington, "[a]s a general rule, a person has no legal duty to protect another from the criminal acts of a third person." Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996). "The Supreme Court has recognized limited exceptions to the general rule of non-liability." Newsom v. B.B., 306 S.W.3d 910, 913 (Tex. Ct. App. 2010). "For instance, a person who controls a premises has a duty to protect an invitee from criminal acts of third persons if the premises owner knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." Newsom, 306 S.W.3d at 913. "Additionally, the existence of a special relationship may impose a duty upon a person to control a third party's conduct." Newsom, 306 S.W.3d at 913. However, unlike in Washington, even where no special relationship exists, Texas law requires a court to balance several interrelated factors in determining whether to impose a duty: "We must weigh the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins, 926 S.W.2d 287, 289-90 (Tex. 1996).

Applying Washington law to the facts, it is clear that Paccar owed no duty to SATI. First, SATI contends that Paccar had a special relationship with SATI. However, despite the fact that there are a number of published Washington court decisions that address this matter, SATI fails to cite to or analogize to any of

these in support of its contention.[1] Accordingly, we conclude that, under Washington law, no special relationship existed.

Second, SATI contends that even if there is no special relationship, Paccar would have a duty to protect SATI against third party criminal acts if it took affirmative, negligent action that created or exposed SATI to an unusually high degree of harm. From this, SATI argues that a trier of fact likely would find that tendering a document required for issuance of a title to an individual other than the proper recipient exposed the proper recipient to an unusually high degree of harm. In essence, SATI relies on our decision in Parrilla. However, Parrilla is distinguishable.

In Parrilla, we held that a bus driver's affirmative act of leaving an individual who was displaying erratic behavior—due to being heavily under the influence of marijuana and PCP—in a 14-ton bus that was idling on the roadside, created a high degree of risk of harm. Parrilla, 138 Wn. App. at 440-41. Unlike in Parrilla, where the bus driver was aware that he was leaving a highly dangerous instrumentality within easy reach of a severely impaired individual, no evidence in the record suggests that any of the Paccar employees were aware that the recipient of the lien release was an imposter. Moreover, there is no evidence in the record that either Paccar or any of the employees who handled the lien release were aware that Davis had any criminal tendencies. Finally, the record contains uncontroverted evidence that this type of fraud had not occurred

---

[1] See, e.g., Hertog v. City of Seattle, 138 Wn.2d 265, 979 P.2d 400 (1999) (state-probationer); Petersen v. State, 100 Wn.2d 421, 671 P.2d 230 (1983) (psychotherapist-patient); Bernethy v. Walt Failor's, Inc., 97 Wn.2d 929, 653 P.2d 280 (1982) (customer-store owner).

in this Paccar office for nearly 40 years (at least), despite receiving calls like the one from Davis daily. Parrilla does not support SATI's position.

Instead, our Supreme Court's decision in Kim is on point. The court in Kim declined to find a high degree of risk of harm when a rental car company left the keys in the ignition of an automobile in an area where it had never experienced a prior vehicle theft. 143 Wn.2d at 196. The record in this case indicates that the type of fraud perpetrated by Davis had not occurred in the Paccar office for nearly 40 years (at least). Moreover, there is evidence in the record that Paccar receives calls regarding lost titles on a daily basis. Receiving requests like Davis's was a regular occurrence, just as the location of the rental car in Kim was a regular place to leave a car with keys in the ignition. With respect to the "high degree risk of harm" exception recognized by Kim and Parrilla, SATI's argument is unavailing. Accordingly, we conclude that, under Washington law, Paccar did not owe SATI a duty of care.

Applying Texas law to the facts here, we reach the same conclusion: Paccar owed no duty of care to SATI. Seemingly in an effort to establish the existence of a special relationship, SATI cites two cases applying Texas law, neither of which supports a finding that Paccar owed SATI a duty. See Gilstrap v. Beakley 636 S.W.2d 736 (Tex. Ct. App. 1982); City Bank v. Compass Bank, No. EP-10-CV-62-KC, 2010 WL 2680585 (W.D. Tex. 2010).

In Gilstrap, the lender, First National Bank, financed the borrower's loan on an oil rig. 636 S.W.2d at 738. The borrower informed First National Bank that a third party would pay off the loan balance as part of a sale between the

borrower and the third party. 636 S.W.2d at 739. Although the third party did not pay off the loan balance, First National Bank gave him the title without demanding payment or conferring with the borrower. 636 S.W.2d at 739. The court held that First National Bank owed a duty to the lender.

Gilstrap is distinguishable. Gilstrap would only control if Davis had a claim against Paccar, and only if Paccar had released the title to SATI *before* SATI had paid the loan balance. That set of facts is not presented in this appeal. Moreover, the borrower in Gilstrap was a customer of First National Bank, whereas SATI was not a customer of Paccar—it was merely making payments on behalf of Davis.

In City Bank, a corporation obtained a $3,000,000 line of credit from City Bank, and obtained a $4,000,000 line of credit from State National Bank. 2010 WL 2680585 at *1. One of the purposes of the National Bank credit line was to refinance the City Bank credit line, retiring any outstanding debt to City Bank through a direct money transfer from National Bank to City Bank. City Bank, 2010 WL 2680585 at *1. Instead, National Bank made the line of credit available to the corporation without first paying off the City Bank debt. City Bank, 2010 WL 2680585 at *1. When the banks learned that both credit lines were open and had been drawn down simultaneously, they called the corporation into default and initiated conflicting collection efforts. City Bank sued National Bank's new owner, Compass Bank, for the amounts it was unable to recover through collections. City Bank, 2010 WL 2680585 at *1.

The district court denied Compass Bank's motion to dismiss, noting that

- 12 -

Texas may recognize a duty where "the potential victim's identity, the mode of harm, and the way to avoid that harm are all particularly known to the bank in advance." City Bank, 2010 WL 2680585 at *3. Thus, the court found a duty, where National Bank knew that its credit line was supposed to pay off City Bank's old credit line, knew or should have known the safest and most appropriate way to pay off the old credit line, and could easily see the risk of leaving both lines open. City Bank, 2010 WL 2680585 at *3.

City Bank is also distinguishable from the facts presented herein. No evidence in the record suggests that Paccar or Paccar's employees who dealt with Davis had any particular knowledge of Davis's criminal or otherwise fraudulent tendencies. Falling behind on loan payments does not suggest a proclivity for committing fraud. City Bank does not support SATI's argument that a special relationship existed between it and Paccar.

Although SATI has not established the existence of a special relationship with Paccar, Texas law dictates that, even where no special relationship exists, several interrelated factors must be balanced in determining whether to nevertheless impose a duty: "We must weigh the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." Golden Spread Council, 926 S.W.2d at 289-90.

Here, the risk, foreseeability, and likelihood of injury were low. This kind of fraud had not occurred in nearly 40 years (at least) in that particular office, despite the fact that the office received calls similar to Davis's on a daily basis.

Moreover, Paccar had already mailed the certificate of title to the tractor to Anderson. So, even if someone were attempting to perpetrate a fraud, Anderson would have already had an opportunity to record the title and perfect his interest, thereby rendering ineffective any attempted fraud. Furthermore, it was Paccar's policy to ask for identifying information before sending a lien release, such as the one sent to Davis masquerading as Anderson, and there is no evidence in the record that Slater—the Paccar employee who sent the lien release—failed to follow this policy.

Against the above factors, we must also weigh the social utility of Paccar's conduct, the magnitude of the burden on Paccar, and the consequences of placing such a burden on Paccar. The social utility of Paccar issuing lien releases over the phone seems to be significant. Evidence in the record suggests that these kinds of releases are frequently necessary and, as in this case, not all of Paccar's customers can easily access Paccar's office in-person. The magnitude of imposing the burden on Paccar to verify a caller's identity is not particularly high and the consequences of imposing the burden are not high. However, Paccar already adheres to a policy of requiring identifying information. If this court were, nevertheless, to impose a duty whereby Paccar was held liable for any resulting fraud, it would unreasonably punish Paccar for a third party's fraud. On balance, these factors militate against imposing a duty on Paccar.

Because the result of the duty analysis is the same under Washington and Texas law, in concluding that Paccar did not owe a duty of care to SATI, we rely on Washington law.

- 14 -

III

SATI also contends that Paccar formed a contract with SATI by accepting payments from SATI on Davis's behalf and that the existence of this contractual relationship meant that SATI became Paccar's customer. In essence, SATI argues that Paccar promised to forebear from foreclosing on the tractor in exchange for SATI's promise to make payments to Paccar on Davis's behalf. Such an agreement was never made. Although Paccar suggested that SATI could avoid losing the use of Davis's tractor if it made payments on his behalf, Paccar did not promise to forebear from foreclosing on the tractor in exchange for a promise from SATI to make payments on Davis's behalf. "Forebearance, at request, is a valid consideration. Not so, in the absence of both request and promise to forebear." Shaw v. Philbrick, 129 Me. 259, 151 A. 423, 425 (1930) (citation omitted). Given that Paccar did not promise to forebear from foreclosing on the tractor—as evidenced by the record, most notably SATI's practice of paying 60 days after the monthly due date to allow Paccar to foreclose immediately, if necessary—there was no consideration to support the creation of a new contract between SATI and Paccar. Accordingly, we refuse to grant SATI appellate relief on the basis that a new contract was formed that was subsequently breached by Paccar.

Alternatively, SATI contends that it is an "intended beneficiary" of the contract between Paccar and Davis. This argument is untenable. A third party beneficiary contract "requires that the parties intend that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the

- 15 -

contract." <u>Burke & Thomas, Inc. v. Int'l Org. of Masters, Mates & Pilots</u>, 92 Wn.2d 762, 767, 600 P.2d 1282 (1979).[2] That the contracting parties may have desired to confer a benefit on a third party is insufficient. <u>Lonsdale v. Chesterfield</u>, 99 Wn.2d 353, 361, 662 P.2d 385 (1983). SATI fails even to assert that the parties intended for Paccar to assume a direct obligation to SATI at the time Davis contracted with Paccar. No entitlement to appellate relief has been established on this claim.

Affirmed.

We concur:

---

[2] SATI does not assert a conflict between the laws of Texas and Washington with respect to its contract claim. Accordingly, we apply Washington law.