[No. 22016–1–I.   Division One.   January 8, 1990.]

THE STATE OF WASHINGTON, *Respondent*, v. WADE MITCHELL ALLEN, *Appellant*.

---

*Dawn K. Monroe* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Peter Goldman, Deputy,* for respondent.

FORREST, J.—Wade Allen (referred to herein as Brian Dixson) appeals from his conviction after a jury trial on three counts of indecent liberties. We affirm.

Brian Dixson was charged with three counts of indecent liberties on October 15, 1987. The first count claimed that Dixson had unlawful sexual contact with C.P., the victim, between January 1987 and February 28, 1987. The second count charged Dixson with unlawful sexual contact with M.B., a second victim, between January 1987 and March 17, 1987. The last count charged Dixson with unlawful sexual contact with C.P. on or about March 17, 1987.

C.P. lived with her mother in a mobile home park in Auburn, Washington at the time of the pertinent incidents. She was 13 years old throughout the relevant period. Dixson lived two mobile homes away from her. She testified that the first encounter between Dixson and her occurred

on January 28, 1987. Dixson called C.P. and invited her to his mobile home. She went to Dixson's home, where he tried to kiss her. She left, but returned later that night. They went into a storage shed behind the home. Dixson lifted her onto a shelf and began trying to kiss her, eventually succeeding. Nothing else happened. C.P. quickly went home.

C.P. testified that she saw Dixson almost daily after January 28. Dixson would kiss her and touch her on the skin between the legs and on the chest with his hand. C.P. sometimes was clothed and, on other occasions, was not. She stated that they would follow this pattern each time they were together. On two or three occasions, Dixson put her hand on his erect penis. Her testimony was corroborated by M.B. M.B. accompanied C.P. to Dixson's home on each occasion except the first and the last. She was 11 years old during the relevant period. She testified that Dixson would touch C.P. on "her breasts and her legs and her bottom" almost every day. Dixson would then carry C.P. into his bedroom. M.B. testified that Dixson also once touched her breasts and attempted to put his hand under her pants. M.B. could not recall the date on which this happened.

On March 17, 1987, C.P. testified she went to Dixson's home alone. They went into his bedroom. He removed her shirt and bra and began touching her. After 10 minutes, C.P.'s mother began knocking on the locked door. Her mother had learned C.P. was inside Dixson's mobile home. C.P. quickly dressed and then opened the door. Her mother's boyfriend grabbed her, took her home and called the police.

Dixson's testimony flatly contradicted the testimony given by C.P. and M.B. He claimed never to have had any physical contact with either of them. He stated that someone else was always present whenever C.P. was visiting. He further testified that on March 17, 1987, many neighborhood children had been at his home watching a movie he

had rented. C.P. stayed after most of the kids left. Her mother began pounding on his door. He opened the door and C.P. was dragged home by her mother's boyfriend.

Dixson was arrested in the early morning of March 18, 1987. He gave the name "Fox" to the arresting officer when asked his identity, and produced a birth certificate with the same name. The trial court denied defense counsel's pretrial motion to exclude evidence of Dixson's use of an alias when arrested.

Dixson was found guilty as charged by a jury on all three counts of indecent liberties. No jury unanimity instruction was given. On February 1, 1988, prior to sentencing, the trial court heard defense counsel's motion to withdraw at Dixson's request. Dixson offered no explanation for seeking a new attorney. The court denied the motion. At sentencing on March 18, 1988, Dixson stated he felt his lawyer had been ineffective. He was sentenced to 27 months of confinement on each count, to run concurrently.

### ABSENCE OF JURY UNANIMITY INSTRUCTION

Dixson contends the trial court erred in failing to give a jury unanimity instruction with regard to count 1 or, alternatively, it erred in failing to require the State to elect which specific act it was relying on for conviction. The State concedes the trial court erred, but claims it was harmless error.

When the prosecution presents evidence of several acts that could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specific criminal act. The failure to follow one of these options is error which violates the defendant's state constitutional right to a unanimous jury verdict and United States constitutional right to a jury trial. The error is presumed to be prejudicial and is deemed harmless only if no rational juror could have a reasonable doubt as to whether

each incident established the crime beyond a reasonable doubt.[1]

The court in *State v. Kitchen, supra,* considered three consolidated cases, each of which included "multiple acts", in which the trial court had failed to instruct the jurors that they were required to unanimously agree on which of the several acts alleged actually occurred. In the first two cases, the court held there was conflicting testimony as to each of the multiple acts for which evidence was presented, and that a rational juror could have entertained a reasonable doubt as to whether one or more of them actually occurred; some jurors could have found one act to have occurred, while others could have found another act to have occurred. Hence, failure to give a jury unanimity instruction was not harmless error.

Although the third case was a collateral attack reviewed under the actual prejudice standard, it is important because the defendant (Childress) did not refute either of the alleged occurrences. As in our case,

the jury was presented with no means to discriminate between the two incidents attested to by the victim. In this respect, Mr. Childress' trial was similar to *People v. Deletto,* 147 Cal. App. 3d 458, 473, 195 Cal. Rptr. 233 (1983), *cert. denied,* 466 U.S. 952 (1984), where the prosecution's only evidence was testimony from the victim and defense presented no evidence to allow the jury to distinguish between the alleged acts; the court thus determined that the evidence did not permit the jury to rationally discriminate between the two incidents. The *Deletto* court held that failure to ensure jury unanimity on a single incident constituting the crime charged was harmless error.

*Kitchen,* at 413–14.

As in the third consolidated case in *Kitchen,* and unlike the first two, we do not believe jurors considering the evidence against Dixson on count 1 could have rationally reached a different conclusions as to the different acts which occurred during the period charged. Count 1 charged

---

[1]*State v. Kitchen,* 110 Wn.2d 403, 409, 756 P.2d 105 (1988); *State v. Petrich,* 101 Wn.2d 566, 570, 683 P.2d 173 (1984); *State v. Gitchel,* 41 Wn. App. 820, 823, 706 P.2d 1091, *review denied,* 105 Wn.2d 1002 (1985); *State v. Badda,* 63 Wn.2d 176, 182, 385 P.2d 859 (1963).

Dixson with indecent liberties against C.P. between January 28, 1987, and February 28, 1987. C.P. testified that her first contact with Dixson was on January 28, 1987, when he picked her up and placed her on a table in the storage shed and kissed her. Thereafter Dixson engaged in touching C.P. on her skin between the legs and on the chest during each visit to his mobile home. All of the foregoing acts, if they occurred, constitute indecent liberties.[2]

Dixson controverted this testimony by broadly denying any physical contact with C.P. He did not attempt to distinguish among or question any specific incidents charged in count 1 to which C.P. had testified. Nor did defense counsel's cross examination challenge any specific incidents of indecent liberties or attempt to draw any factual distinctions among them. This case is distinguishable, then, from *Kitchen,* in which the defendants in the first two consolidated cases introduced evidence controverting different incidents of alleged improper contact. In both cases the defendants produced character witnesses and attempted to impeach the victims with past contradictory statements. Dixson did not produce any such evidence.

In view of Dixson's general denial of any improper physical contact and C.P.'s testimony that substantially the same contact occurred during each visit, we find no rational basis for jurors to distinguish among the acts charged in count 1. The jurors had either to believe Dixson and acquit or believe C.P. and convict. There is no possibility that "some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." *Kitchen,* at 411. We hold the lack of a jury unanimity instruction or election by the State to be harmless error on the facts of this case.

### DENIAL OF REQUEST FOR NEW COUNSEL

Dixson contends the trial court erred in denying his posttrial request for appointment of a new attorney because

---

[2]*See In re Adams,* 24 Wn. App. 517, 519, 601 P.2d 995 (1979); *State v. Brooks,* 45 Wn. App. 824, 727 P.2d 988 (1986).

of his dissatisfaction with certain strategic decisions made by defense counsel. He claims his lawyer was ineffective and had a conflict of interest because he could not adequately represent Dixson during the motion to withdraw as attorney of record and at sentencing.

■ A defendant has been denied effective assistance of counsel when defense counsel's performance falls below an objective standard of reasonableness upon considering all surrounding circumstances, and the defendant was prejudiced by this deficiency.[3] An appellate court reviewing counsel's performance must indulge in a strong presumption that it falls within the broad range of reasonable professional assistance.[4] The defendant bears the burden of showing there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

Washington courts have refused to find ineffective assistance of counsel when the actions of counsel about which defendant complains go to the theory of the case or trial tactics.[5] Determining which witnesses to call is a legitimate area of counsel's trial strategy.[6] As well stated by the court in *State v. Piche,* 71 Wn.2d 583, 590, 430 P.2d 522 (1967), *cert. denied,* 390 U.S. 912 (1968).

> To assure the defendant of counsel's best efforts then, the law must afford the attorney a wide latitude and flexibility in his choice of trial psychology and tactics. If counsel if to be stultified at trial by a post trial scrutiny of the myriad choices he must make in the course of a trial: whether to examine on a

---

[3]*In re Peters,* 50 Wn. App. 702, 703–04, 750 P.2d 643 (1988); *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

[4]*Peters,* at 704.

[5]*State v. Renfro,* 96 Wn.2d 902, 909, 639 P:2d 737, *cert. denied,* 459 U.S. 842 (1982); *State v. Ermert,* 94 Wn.2d 839, 849, 621 P.2d 121 (1980).

[6]*State v. Wilkinson,* 12 Wn. App. 522, 530 P.2d 340, *review denied,* 85 Wn.2d 1006 (1975).

fact, whether and how much to cross–examine, whether to put some witnesses on the stand and leave others off—indeed, in some instances, whether to interview some witnesses before trial or leave them alone—he will lose the very freedom of action so essential to a skillful representation of the accused.

Moreover, the determination of whether the defendant's dissatisfaction with counsel is justified and warrants appointment of another attorney rests in the discretion of the trial court.[7] This rule applies whether counsel is appointed or, as here, retained.[8]

Dixson's attorney brought a posttrial motion requesting withdrawal and appointment of substitute counsel. Dixson did not explain when given the opportunity at the hearing on his motion why he sought appointment of new counsel. The trial court concluded defense counsel had acted professionally and denied the motion. Dixson raised the matter again at sentencing, explaining his dissatisfaction with defense counsel, but did not renew his earlier motion.

Although he was dissatisfied with counsel's decision not to call certain witnesses, Dixson never explained how such witnesses would assist him in controverting the charges. The trial court concluded Dixson had received a fair trial and refused to set the verdict aside. The court did not abuse its discretion. Moreover, Dixson failed to carry the burden of showing a reasonable probability that, but for the claimed errors of counsel, the result of the proceeding would have been different. His contention that his attorney had a conflict of interest which denied him effective representation is wholly meritless.

## PROSECUTORIAL MISCONDUCT

Dixson contends certain statements made by the prosecutor during closing and rebuttal arguments denied him a fair trial. The prosecutor stated that C.P. and M.B. were telling the truth and were credible. The prosecutor also

---

[7]*State v. Shelton,* 71 Wn.2d 838, 840, 431 P.2d 201 (1967); *State v. Lytle,* 71 Wn.2d 83, 84, 426 P.2d 502 (1967).

[8]*Wilkinson,* at 524.

stated Dixson was not believable and may have suggested he was lying about having a girl friend named Tina.

In determining whether prosecutorial misconduct has occurred, the reviewing court first evaluates whether the prosecutor's comments were improper. If the statements were improper, the court then considers whether there was a substantial likelihood that the comments affected the jury.[9]

A statement by counsel clearly expressing a personal belief as to the credibility of the witness or the guilt or innocence of the accused is forbidden.[10] A prosecutor, however, is not barred from analyzing the apparent credibility of witnesses, nor from emphasizing weaknesses in the defendant's case.[11] Prejudicial error does not occur until such time as it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion.[12]

As stated in *State v. Charlton*, 90 Wn.2d 657, 661, 585 P.2d 142 (1978), unless prosecutorial misconduct is

> flagrant and ill intentioned, and the prejudice resulting therefrom so marked and enduring that corrective instructions or admonitions could not neutralize its effect, any objection to such conduct is waived by failure to make an adequate timely objection and request a curative instruction.

Here, defense counsel failed to object to the prosecutor's statements now alleged to be misconduct. Her statements, even if in some degree improper, were not so flagrant as to excuse defense counsel's failure to object. Therefore, Dixson waived objection to the alleged misconduct.

---

[9]*State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984).

[10]*State v. Case,* 49 Wn.2d 66, 298 P.2d 500 (1956); *State v. Sargent,* 40 Wn. App. 340, 343–44, 698 P.2d 598 (1985).

[11]*State v. Pacheco,* 107 Wn.2d 59, 71, 726 P.2d 981 (1986).

[12]*State v. Papadopoulos,* 34 Wn. App. 397, 400, 662 P.2d 59, *review denied,* 100 Wn.2d 1003 (1983).

## Evidence of Use of an Alias

Dixson claims the trial court erred in permitting evidence showing that he gave the arresting officer a false name and a false birth certificate when asked to identify himself and in allowing inquiry as to his use of the name "Brian Dixson". He claims first that the testimony was irrelevant, and second, that any relevance was outweighed by the risk of prejudice.

This issue is controlled by *State v. Cartwright,* 76 Wn.2d 259, 264, 456 P.2d 340 (1969):

> Proof of aliases is not per se inadmissible, for there is no general ban wholly prohibiting reference to them. The test as to whether an alias may be proved or referred to by the state is whether the alias or other name is relevant and material to prove or disprove any of the issues in the case.

Dixson's identity is not in question, but giving a false name and false identification to the officer suggests guilty knowledge and, hence, is relevant. "Relevant evidence" is any evidence which has a tendency to make the existence of any fact that is of consequence to the determination of the issue more probable or less probable than it would be without the evidence.[13] Assessing the relevance of evidence is a matter within the discretion of the trial court.[14] In determining whether relevant evidence is admissible, the court must weigh the probative value against any prejudicial effect it may have.[15]

In the case before us, a sense of guilt is inconsistent with Dixson's denial of any improper contact and, hence, there is substantial probative value to the evidence. Dixson's explanation that he was avoiding a warrant for traffic violations has a minimal prejudicial effect. The facts in this case are more probative and less prejudicial than the alias testimony

---

[13]ER 401; *Petersen v. State,* 100 Wn.2d 421, 439, 671 P.2d 230 (1983).

[14]*Petersen,* at 439; *Maehren v. Seattle,* 92 Wn.2d 480, 488, 599 P.2d 1255 (1979), *cert. denied,* 452 U.S. 938 (1981).

[15]ER 403; *Goodell v. ITT–Federal Support Servs., Inc.,* 89 Wn.2d 488, 573 P.2d 1292 (1978).

found nonprejudicial in *State v. De Gaston.*[16] We find no abuse of discretion in admission of the alias testimony and the questions relative to the name "Brian Dixson".

The judgment below is affirmed.

Swanson, J., and Revelle, J. Pro Tem., concur.

---

[16] 5 Wn.2d 73, 78, 104 P.2d 756 (1940). *See also State v. Miller,* 164 Wash. 441, 448, 2 P.2d 738 (1931) (defendant used aliases to escape detection and arrest, which had bearing on guilt, and such evidence was properly allowed).