# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72359-6-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JOHNSON OMOTERE AYODEJI, | ) | |
| | ) | |
| Appellant. | ) | FILED: January 17, 2017 |

TRICKEY, A.C.J. — A jury convicted Johnson Ayodeji of several counts of child molestation and child rape against two of his daughters. He appeals, raising several issues, including a right to a public trial violation and the lack of a jury instruction on unanimity for some of the multiple acts charges. We hold that the trial court did not violate Ayodeji's right to a public trial because it did not close the courtroom. We also hold the only instructional error was harmless beyond a reasonable doubt. We affirm.

## FACTS

Johnson Ayodeji and Ruth Ayodeji[1] married in 1998. They had their first daughter, E.A., in early 2001, when they were living in Chicago, Illinois. The family moved to Oak Harbor, Washington shortly after E.A.'s birth. Their second daughter, F.A., was born in early 2002.

In the next few years they moved several times, with Ayodeji sometimes living with his family and sometimes not. In 2004, Ruth entered a domestic violence shelter with the girls. They moved among different shelters and YWCA [2]

---

[1] For the sake of clarity, we refer to Ruth Ayodeji by her first name. We intend no disrespect.

[2] The Young Women's Christian Association.

housing until 2005 or 2006. They lived together again as a family in Lynwood, Washington and had twin daughters.[3]

Ayodeji started abusing E.A. around this time or earlier. Her first memory of him abusing her was before they moved to their current house. E.A. described it in a letter to her mother. Ayodeji would touch her breasts and butt and, at least once, put his penis in her butt.

For unrelated reasons, Ruth obtained a restraining order against Ayodeji in 2008. Soon after they started living without Ayodeji, F.A. told Ruth that Ayodeji had touched her private parts and E.A.'s private parts. E.A. confirmed it but would not give more details. Ruth relayed F.A.'s account to Child Protective Services (CPS). The State did not bring charges based on those allegations.

In 2009, Ruth found F.A. and E.A. "having oral sex with each other."[4] F.A. told Ruth that "[D]addy did that."[5] Ruth brought her daughters to a family friend, who was a counselor, to talk about it. Both girls told the counselor that their father had done it to them in their family's computer room. The counselor notified CPS.

E.A. and F.A. would not talk to CPS or the prosecutor's office about the abuse. After several months, the authorities dropped the case. Ayodeji moved out of state and the family did not see him for almost three years.

Around this time, E.A. and F.A. would occasionally write letters to their mother. Some of these letters described sexual abuse by Ayodeji. Later, the girls told their mother that what they had written was not true. They said they had

---

[3] Sometime later, Ruth and Ayodeji had another set of twins.
[4] Report of Proceedings (RP) (July 24, 2014) at 66.
[5] RP (July 24, 2014) at 67.

learned sexual activity from the computer and blamed it on their father because they were mad at him.

In January 2013 Ayodeji moved in with his family in Everett. Once, when Ayodeji was trying to show Ruth family pictures on his cell phone, Ruth saw that Ayodeji had a video of E.A. masturbating.

Ayodeji had begun abusing E.A. again. E.A. had just turned 12 years old. Ayodeji would touch E.A. with his penis in their computer room, his bedroom, and in her bedroom. At least once, Ayodeji video recorded E.A. in her bedroom being forced to perform oral sex. Ayodeji entered E.A.'s bedroom and raped her.

Ayodeji would make F.A. give him an erection by applying lotion with her hands. Sometimes Ayodeji would touch her vagina with his hands. Ayodeji usually molested F.A. in her own bedroom, but sometimes they were in his bedroom. Once or twice Ayodeji abused F.A. and E.A. simultaneously, in E.A.'s bedroom.

On May 17, 2013, sometime during the very early morning hours, Ruth found Ayodeji in F.A.'s bed, "having sex" with F.A.[6] Ayodeji was wearing only his boxer shorts. When Ruth discovered them, she screamed and ran upstairs. He followed after her, telling her that he had been just hugging F.A. and that his penis was not hard. Ruth noticed that the flap of his boxer shorts was wet.

Ruth spoke to a former co-worker, who was working for CPS at the time, about how to handle the situation. She reported the incident to the police. The State charged Ayodeji with several counts of child rape and child molestation. The charges included one count of child rape in the first degree and two counts of child

---

[6] RP (July 24, 2014) at 125; RP (July 25, 2014) at 88-89.

molestation of F.A., and one count of rape of a child in the first degree, one count of rape of a child in the second degree, and two counts of child molestation of E.A.

E.A. and F.A. were examined at a hospital and spoke with a child interview specialist. E.A. was very reserved with the interviewer when they began to discuss the abuse. To help make E.A. more comfortable, the interviewer had E.A. write down her answers.[7] E.A. told the interviewer that her father had not taken any pictures of her.

After they returned from the interviews, F.A. called the prosecutor's office and left a voicemail that E.A. had forgotten to tell the interviewer that their father had a video of E.A. "sucking his D."[8] E.A. told a detective that Ayodeji "videoed [sic] her on her bed . . . while she was giving him oral sex."[9]

Ruth provided the police with a removable secure digital (SD) card[10] from one of Ayodeji's cell phones, which she had found in Ayodeji's car. A computer forensic specialist found the video that E.A. had described on the SD card, though it had been deleted.

The forensic specialist determined that the video was created on May 8, 2013. The SD card also had two images that looked like they were from the same episode. A digital imaging specialist found similar images of a young girl touching an adult male penis on Ayodeji's cell phone. The man's face was not visible in the video or pictures.

---

[7] RP (July 28, 2014) at 75.
[8] RP (July 29, 2014) at 23; RP (July 22, 2014) at 37.
[9] RP (July 29, 2014) at 24.
[10] An SD card is used to store data, including pictures and videos, in cell phones and cameras.

At trial, F.A. described the incident on May 17 in more detail and testified that it had happened more than once.

At trial, Ruth identified the man in the in pictures with E.A. as Ayodeji by his boxer shorts and private parts. She also testified that there were no other dark-skinned adult men who were in the house with any regularity. Ayodeji argued that Ruth was fabricating all the evidence to get him out of their lives and to get back at him for some misdeeds in the past.

The trial court admitted a Christmas card and letter that Ayodeji sent Ruth and the children after he was arrested. The letter and card were mostly about Christian values and Ayodeji's beliefs. Ruth testified that she felt he was using the Bible to tell her she should forgive him.

The trial court admitted the video of E.A. pulled from Ayodeji's SD card as an exhibit. The State played the video in the courtroom during the trial. The State intentionally set up the television so that the parties and jurors could see it but the spectators could not. Ayodeji took "no position" on how they displayed the video.[11]

The jury convicted Ayodeji of all charges. He appeals.

ANALYSIS

Public Trial

Ayodeji argues that the trial court violated his right to a public trial when it played the video recovered from the SD card so that the public could not see it. Because we hold that there was no courtroom closure, we disagree.

Criminal defendants have a right to a public trial, stemming from the

---

[11] RP (July 28, 2014) at 106.

constitutional guarantee that "[j]ustice in all cases shall be administered openly" and the defendant's constitutional right to a "speedy public trial." WASH. CONST. art. I, § 10, 22; State v. Love, 183 Wn.2d 598, 604-05, 354 P.3d 841 (2015). The right to a public trial "ensure[s] a fair trial, . . . remind[s] the prosecutor and [the] judge of their responsibility to the accused and the importance of their functions, . . . encourage[s] witnesses to come forward, and . . . discourage[s] perjury." State v. Sublett, 176 Wn.2d 58, 73, 292 P.3d 715 (2012).

The court must determine first, whether the public trial right is implicated, second, whether there was a closure, and third, whether the closure was justified. State v. Smith, 181 Wn.2d 508, 513, 334 P.3d 1049 (2014). We review whether the trial court violated a defendant's right to a public trial de novo. Smith, 181 Wn.2d at 513.

*Right to a Public Trial Implicated*

"[N]ot every interaction between the court, counsel, and defendants will implicate the right to a public trial or constitute a closure if closed to the public." Sublett, 176 Wn.2d at 71. The court applies a two-prong "experience and logic" test to see whether the right to a public trial attaches to a particular proceeding. Sublett, 176 Wn.2d at 73. Under that test, the defendant must show both that the "'place and process have historically been open to the press and general public'" and that "'public access plays a significant positive role in the functioning of the particular process in question.'" Sublett, 176 Wn.2d at 73 (quoting Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8-10, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)).

No published Washington decision has determined whether the right to a public trial attaches to the presentation of exhibits in the courtroom. But exhibits are a form of evidence. And the right to a public trial attaches to evidentiary phases of the trial. Sublett, 176 Wn.2d at 71-72. The admission and the introduction of evidence has historically taken place in open court. Thus, the experience prong weighs in favor of holding that the right to a public trial attaches to this phase of proceedings.

The public cannot fully "observe the process and weigh the defendant's guilt or innocence" if it has no access to a crucial exhibit. See Smith, 181 Wn.2d at 518. Providing access to all admitted exhibits also encourages witnesses to come forward. Therefore, logic also weighs in favor of ensuring some access to trial exhibits.

Recently, in State v. Magnano, this court strongly suggested that the right to a public trial requires the playing of audio exhibits in court. 181 Wn. App. 689, 699, 326 P.3d 845 (2014). There, the court held that allowing the jury to replay audio recordings in a closed courtroom during deliberations did not violate the defendant's right to a public trial. Magnano, 181 Wn. App. at 700. But the court noted that the purposes of a public trial had already been "served by offering audio recording evidence, admitting it or not, and playing it for the jury in open court." Magnano, 181 Wn. App. at 699. We conclude that the right to a public trial does attach to the use of exhibits.

The State argues that the public trial right does not attach here because exhibits have not historically been made available for spectators to view and

handle.[12] But exhibits have historically been presented in open court. We conclude that the manner in which parties have historically presented evidence relates more to whether there was a closure, which we discuss next.

*Closure*

Two kinds of closures impact a defendant's right to a public trial. The first, an express closure, occurs "when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." State v. Lormor, 172 Wn.2d 85, 93, 257 P.3d 624 (2011). The second kind of closure occurs when the proceeding is "held someplace 'inaccessible' to spectators, usually in chambers." Love, 183 Wn.2d at 606 (quoting Lormor, 172 Wn.2d at 93). The court uses the experience and logic test to determine whether there was a closure. In re Yates, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013).

Experience and logic do not suggest that there is a closure every time an admitted exhibit is not displayed to the spectators. Some exhibits go back to the jury for deliberations without ever being published to the jury in the courtroom.[13] The public gains access to those exhibits when they become part of the court

---

[12] Relying on a similar argument, several federal cases have held that there was no violation of the public trial right when the court did not play audio evidence for all spectators to hear. Gillars v. United States, 182 F.2d 962, 977-78 (D.C. Cir. 1950); United States v. Lnu, 575 F.3d 298, 308 (3rd Cir. 2009); D'Aquino v. United States, 192 F.2d 338, 365 (9th Cir. 1951). But in those cases, the courts did not follow the three steps outlined in Smith. See 181 Wn.2d at 513.

   In Gillars, the court also provided a limited number of earphones to spectators and members of the press. 182 F.2d 977-78. There may have been no violation because there was no closure, not because the right to a public trial did not attach. Similarly, in Lnu, the court noted "the limited nature of [its] holding" and emphasized that the recordings were already in the public record and available for public scrutiny when played via headphones. 575 F.3d at 308.

[13] In this case, for example, the State read some but not all of exhibit 65 during its examination of Ruth, and noted "the jury can read this later." RP (July 25, 2014) at 16.

record. GR 31(a), (c)(4).

In Love, the defendant argued that there was a closure during voir dire because the attorneys discussed challenges for cause at the bench, which the spectators could not hear, and exercised their peremptory challenges in writing. 183 Wn.2d at 604. The court rejected this argument because the public was present in the courtroom during all of jury selection, observed the questioning of jurors, and saw which jurors were ultimately empaneled. Love, 183 Wn.2d at 607. The court held that the public's presence during this process served to remind "those involved about the importance of their roles and [would] hol[d] them accountable for misconduct." Love, 183 Wn.2d at 606-07.

Noting that the transcript of the bench discussions and the struck juror sheet were "both publically available," the court held that the public "could scrutinize the selection of Love's jury from start to finish." Love, 183 Wn.2d at 607. The court emphasized the role that the public record plays in public trial cases by holding that, "written peremptory challenges are consistent with the public trial right so long as they are filed in the public record." Love, 183 Wn.2d at 607.

Here, Ayodeji does not maintain that there was an express closure. Instead, he argues that preventing the public from seeing the exhibit during trial amounted to a closure. It is clear from the record that the parties deliberately prevented the public from viewing the video. The public was not able to see the content of the video, just as the public could read not the written peremptory challenges in Love. But the public was able to observe the State offer the video into evidence, see who authenticated the exhibit, and get a general sense of its content from the testimony

about it. Thus, this case is nearly indistinguishable from Love. There was no closure.

Ayodeji argues that, unlike the written challenges in Love, the video never became a part of the public record. Therefore, it was never subject to public scrutiny. But, as the parties explained during oral argument, the decision not to place the video in the public record came after trial, and after proper consideration of the Ishikawa factors.[14] See Seattle Times Co. v. Ishikawa, 97 Wn.2d 30, 38, 640 P.2d 716 (1982). We hold that the trial court did not violate Ayodeji's right to a public trial.

## Sufficiency of Evidence

Ayodeji argues next that it is impossible to determine whether the jury's verdict relied on acts of child molestation for which there was insufficient proof. The State alleged multiple acts of child molestation but provided insufficient evidence to convince a jury beyond a reasonable doubt that some of those acts occurred. Therefore, Ayodeji argues, the child molestation convictions should be vacated and dismissed. We disagree. The jury could not have relied on acts for which there is insufficient proof because the court instructed the jury on the elements of child molestation and the court presumes that jurors follow their instructions.

---

[14] Wash. Court of Appeals oral argument, State v. Ayodeji, No. 72359-6-I (July 26, 2016), at 13 min., 40 sec. to 14 min., 16 sec.; 20 min., 27 sec. to 21 min., 20 sec. During discovery, the parties agreed to a protective order, restricting either party from making copies of the image and audio evidence and requiring that it not be "given, loaned, sold, shown, displayed or in any way provided to any member or associate of the media, the public, or third parties unless expressly permitted by court order, or during trial." Clerk's Papers (CP) at 156. In his briefing, Ayodeji treated this order as sealing the exhibit.

The State bears the burden of proving every element of a charged crime beyond a reasonable doubt. State v. Larson, 184 Wn.2d 843, 854, 365 P.3d 740 (2015). We review all evidence in the light most favorable to the State. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

In State v. Stark, the State charged the defendant with one count of rape and one count of indecent liberties. 48 Wn. App. 245, 246-47, 738 P.2d 684 (1987). The victim recounted three times that the defendant had abused her. Stark, 48 Wn. App. at 250. Only two of these acts would have met the statutory definition of rape. Stark, 48 Wn. App. at 250-51. The jury convicted the defendant. Stark, 48 Wn. App. at 247. The defendant argued that the court could not tell whether the jury relied on the one act that did not meet the definition. Stark, 48 Wn. App. at 251. The trial court instructed the jury on the elements of the crime. Stark, 48 Wn. App. at 251. The court held that, because reviewing courts assume that juries follow their instructions, the jury could not have relied on the act that did not satisfy the elements of the crime. Stark, 48 Wn. App. at 251.

Here, the trial court instructed the jury on the elements of child molestation: the defendant must have had sexual contact with a victim who is less than 12 years old, not married to the defendant, and at least 36 months younger than the defendant. The instructions also defined sexual contact as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party."[15] Finally, the court instructed the jury that it must unanimously agree on which acts of child molestation it relied.

---

[15] CP at 81.

Ayodeji argues that many of his contacts with his daughters do not fit the definition of sexual contact because there is insufficient evidence that those acts were for the purpose of sexual gratification. Accordingly, this court cannot be certain that the jury relied on acts supported by sufficient proof. We disagree.

This case is indistinguishable from Stark. Ayodeji concedes that some of the child molestation acts are supported by sufficient evidence. Assuming that the jury followed its instructions, it could not have convicted Ayodeji without unanimously concluding that, on specific occasions, he touched the sexual parts of his daughters for sexual gratification. There was no error.

### Jury Unanimity

Ayodeji argues that the trial court erred by failing to give an instruction on jury unanimity for the rape of a child charges in this multiple acts case, and that the error was not harmless beyond a reasonable doubt. We agree that this was error but conclude it was harmless.

The jury's verdict must be unanimous. WASH. CONST. art. 1, § 22. Thus, when the evidence shows that the defendant committed multiple acts, the jury must agree upon which act it is relying for a guilty verdict. State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), holding modified by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988). An instruction on jury unanimity for a multiple acts case is commonly referred to as a Petrich instruction.

#### Invited Error & Issue Preservation

As an initial matter, the State argues that Ayodeji invited any error on this issue by failing to propose a Petrich instruction for the child rape counts while

suggesting other modifications to the to-convict instruction for those counts. We disagree. Ayodeji had no duty to request a Petrich instruction and his suggestions regarding the to-convict instruction concerned double jeopardy, not jury unanimity.

A defendant cannot seek appellate review of an error he creates. State v. Henderson, 114 Wn.2d 867, 868, 792 P.2d 514 (1990). This court has refused to review the failure to give a Petrich instruction where the defendant "strenuously opposed the trial court's plan to give" one. State v. Carson, 179 Wn. App. 961, 973-74, 320 P.3d 185 (2014) aff'd, 184 Wn.2d 207, 357 P.3d 1065 (2015). But acquiescing in a trial court's erroneous instruction, or failing to object to it, is not the same as inviting that error. State v. Corn, 95 Wn. App. 41, 56, 975 P.2d 520 (1999). The State "ordinarily assumes the burden of proposing an appropriate and comprehensive set of instructions." State v. Hood, 196 Wn. App. 127, 382 P.3d 710, 713 (2016).

Here, Ayodeji did not propose an erroneous jury instruction. Ayodeji did not object to giving a Petrich instruction for the child rape counts. He had no opportunity to object to the instruction—no one proposed one. During the parties' discussion about jury instructions, Ayodeji pointed out that the to-convict instructions needed to make it clear that, for each count of child molestation, the act needed to be "separate and distinct" not only from the other acts of child molestation, but also from the acts constituting child rape.[16] Ayodeji expressed his concern that, without that modification, the jury could say that the same conduct constituted sexual intercourse and child molestation. It is clear from the record

---

[16] RP (July 29, 2014) at 160.

that Ayodeji's suggestions were geared toward avoiding double jeopardy, rather than securing jury unanimity. Ayodeji did not invite this error.

But Ayodeji also did not object to the trial court's failure to give a Petrich instruction for child rape charges. Ordinarily, this court does not review issues raised for the first time on appeal. RAP 2.5(a). But, because of the constitutional implications of failing to give a Petrich instruction, courts have held that a defendant may raise the issue for the first time on appeal. RAP 2.5 (a)(3); State v. Fiallo-Lopez, 78 Wn. App. 717, 725, 899 P.2d 1294 (1995); State v. Holland, 77 Wn. App. 420, 424, 891 P.2d 49 (1995). Ayodeji may raise this issue.

*Jury Instructions*

Ayodeji argues that the failure to give a Petrich instruction for the child rape counts violated his right to a unanimous verdict. The State responds that, when viewed as a whole, the jury instructions informed the jury that it had to be unanimous about which act it relied on for each count of child rape. We disagree.

As mentioned above, a criminal defendant has a constitutional right to a unanimous jury verdict. Petrich, 101 Wn.2d at 572. If the State presents evidence of multiple acts, it must either elect which act it wishes the jury to rely on for the conviction, or have the court instruct the jury that it must unanimously agree on a specific act to support the conviction. Petrich, 101 Wn.2d at 572.

Here, the court failed to give a Petrich instruction for the child rape counts. Although the evidence for each count focused on a specific act, the State provided evidence of multiple acts for two of the counts. The State did not elect specific acts in its closing argument. This failure is a constitutional error.

14

The State argues that the instructions informed the jury that it had to reach a unanimous decision on the child rape counts. We disagree. The only Petrich instruction that the trial court gave focused exclusively on the child molestation counts. There is no reason for a reviewing court to assume that the jury would have known that the Petrich instruction also applied to the child rape counts. The State asserts that a combination of the child molestation Petrich instruction, unanimous verdict instruction, and "separate and distinct" act language in the to-convict instruction was sufficient here.[17] But the State cites no authority for the position that other jury instructions can remedy the lack of a proper Petrich instruction.

The State also argues that there was no error because the State told the jury that it had to be unanimous on each of the seven counts during its closing argument. Again, the State cites no authority that discussing unanimity in its closing argument, which at best supplements the trial court's instructions, renders a Petrich instruction unnecessary.

*Harmlessness*

Ayodeji contends that the failure to give a unanimity instruction for these counts was not harmless. He argues his daughters' credibility was undermined by their past recantations and the inconsistencies between their trial testimony and previous reports of abuse. We conclude that the error was harmless because if the jury believed E.A.'s and F.A.'s testimony for the rapes described in detail it would have no reasonable doubts about the other rapes.

---

[17] CP at 73-74.

15

A reviewing court presumes that the failure to give a Petrich instruction is prejudicial. State v. Coleman, 159 Wn.2d 509, 512-13, 150 P.3d 1126 (2007). The court will uphold the conviction "only if no rational juror could have a reasonable doubt as to any of the incidents alleged." Coleman, 159 Wn.2d at 512. This court considers the error harmless when there is "no rational basis for jurors to distinguish among the acts." State v. Allen, 57 Wn. App. 134, 139, 787 P.2d 566 (1990). But, the error is not harmless when there is "conflicting testimony" about the different acts, including when the complaining witness has made contradictory statements. Kitchen, 110 Wn.2d at 412.

In State v. Loehner, a child victim described one act of rape in detail and then said that the same thing happened other times. 42 Wn. App. 408, 409-10, 711 P.2d 377 (1985). The court held that the error was harmless because "[i]f the rational trier of fact entertained a reasonable doubt as to the episode described in detail, of necessity [it] would have a reasonable doubt as to the subsequent ones, also." Loehner, 42 Wn. App. at 410; see also Allen, 57 Wn. App. at 139; State v. Camarillo, 115 Wn.2d 60, 71-72, 794 P.2d 850 (1990).

In Kitchen, the court held that the error was not harmless because the jury heard "conflicting testimony" about each act. 110 Wn.2d at 412. But, in State v. Bobenhouse, the court held that a unanimity instruction error was harmless when the uncontroverted evidence was that a father had forced his son "to regularly perform fellatio on him and . . . inserted his finger into [the son's] anus on at least one occasion." 166 Wn.2d 881, 886, 894-95, 214 P.3d 907 (2009).

Here, Ayodeji was charged with three counts of child rape. The charging

period for the first count, first degree child rape of E.A., was January 8, 2006 through January 7, 2013. The evidence for this count was a letter that E.A. wrote to her mother saying that Ayodeji put his penis in her butt. The State did not submit other acts for this count.[18] Because there were not multiple acts, there was no error.

The second count, first degree child rape of F.A., had a charging period of February 9, 2007 through May 17, 2013. The main episode for this count was that, on May 17, 2013, Ruth caught Ayodeji on top of F.A., apparently "having sex."[19] F.A. testified that it had happened several other times.

Finally, the third count was second degree child rape of E.A. Because the charging period for this count started after E.A. turned 12, it was considerably shorter, only January 9, 2013 through May 17, 2013. There was a video of E.A. being forced to perform oral sex acts within this period.[20] Ayodeji also put his penis in E.A.'s vagina, after she turned 12.

Relying on alleged inconsistencies and recantations, Ayodeji argues that

---

[18] There was also testimony, from Ruth, that Ayodeji had performed oral sex on both of his daughters in 2009, which is during the charging periods for the first two rape of a child counts. Ruth testified that her daughters told her Ayodeji had performed oral sex on them, after Ruth had caught them having oral sex with each other. But, later, the girls told her that they had learned the sexual information from the computer but blamed it on their father because they were "mad" at him and "he was gone." RP (July 24, 2014) at 105. E.A. and F.A. did not testify about these incidents.

The evidence of these acts, consisting only of contradicted hearsay, was insufficient to consider them part of the multiple acts submitted to the jury. See State v. Jones, 71 Wn. App. 798, 822-23, 863 P.2d 85 (1993).

Similarly, E.A. testified that her father "came in [her] room and made [her] have sex with him." RP (July 25, 2014) at 188. No one, including E.A., provided any evidence from which a jury could conclude that this occurred before E.A. turned 12. We do not consider this one of the acts for count I. See Jones, 71 Wn. App. at 822-23.

[19] RP (July 24, 2014) at 124-25.

[20] There were also photographs of E.A. with her hand on an adult male's penis, but those are relevant to other counts because they are evidence of child molestation, not child rape.

the error was not harmless. Most of the inconsistencies Ayodeji points out between E.A.'s and F.A.'s trial testimony and their earlier reports of abuse related to acts not amounting to rape or related to events before the rapes that E.A. and F.A. described.[21] Similarly, most of the recantations Ayodeji cites were earlier and for different acts.[22]

Ayodeji also challenges his daughters' credibility in general and cites their denials of sexual abuse that were unrelated to any particular act.[23] But, in order to convict Ayodeji, the jury would have had to find E.A. and F.A. credible. This is not a case where either E.A. or F.A. recanted their allegations for some of the rapes within the charging period but remained consistent about other acts. The various challenges to their credibility would not allow a jury to distinguish between the rapes.

Ayodeji argues that the instruction was not harmless for the second rape of a child count because F.A.'s testimony about the other rapes was too uncertain and vague. F.A. testified that the rapes happened "all the time" but could not

---

[21] For example, F.A. testified that her father had made her use lotion to make his penis hard and that it had happened in various rooms. She did not mention that during earlier interviews.

[22] Both E.A. and F.A. denied the abuse or said they could not remember some aspects of the abuse in 2010. E.A. told an interviewer in 2013 that her father had never taken sexual pictures of her. The sexual photographs recovered in this case show E.A. touching Ayodeji's penis. The visual evidence of acts amounting to rape was a video. Ayodeji does not point out any testimony in which E.A. told someone her father had never taken video of her.

[23] For example, both E.A. and F.A. said at one point that Ayodeji gave them money after the May 17, 2013 incident, but later said he had not. Ayodeji testified that Ruth had said F.A. would "makeup [sic] any story." RP (July 29, 2014) at 120-21. F.A. also, apparently, wrote in her journal that Ayodeji had gotten her pregnant. E.A. told a nurse practitioner that she was a virgin in 2010, but she made that statement during a forensic examination that she did not want to cooperate with, and there was also no testimony showing that E.A. knew what the word meant.

explain the frequency with any more specificity.[24] In <u>Kitchen</u>, the uncertainty about dates and times mattered because there was conflicting testimony about each of the acts. 110 Wn.2d at 406-07, 412. But, here, there is no need for dates and times because Ayodeji's defense was a blanket denial. This case more closely resembles <u>Bobenhouse</u>, where the same acts occurred regularly. See 166 Wn.2d at 886, 894-95. F.A.'s testimony did not suggest any confusion about what Ayodeji had done. There was nothing to distinguish this act from the others. The error was harmless for the second count.

Ayodeji argues the error was not harmless for the third count because E.A.'s testimony about the times that Ayodeji put his penis in her vagina was too vague, showing she was uncertain. A fair reading of E.A.'s testimony shows she was reluctant to talk, not uncertain of what happened. The State had E.A. spell some words, like penis, rather than say them, and used nonsexual language to describe relevant body parts to avoid naming them.[25] E.A. frequently testified that she could not remember details about Ayodeji's acts or when he did them. But when the prosecutor asked her if she was "having trouble remembering" or "uncomfortable talking about it entirely" she said she was "uncomfortable talking about it."[26] She struggled to say what part of her body Ayodeji had touched with his penis, but, on redirect, agreed with her earlier statement that it was her vagina.

The earlier statement came from an interview where E.A. was able to

---

[24] RP (July 25, 2014) at 112, 118.

[25] For example, the prosecutor asked, "I'm trying to figure out a way to make you say it without having to say it again, in the front part of his body or the back part of his body?" RP (July 25, 2014) at 174.

[26] RP (July 25, 2014) at 173-74.

whisper the right words to one of the interviewers and have the interviewer write them down. Similarly, E.A. would not describe the specific acts that Ayodeji video recorded, but said they were different from the kind of touching she had already described. Ayodeji claimed he had never seen the video or pictures until they were shown in court. He claimed Ruth was setting him up. But he did not have any specific conflicting testimony about any of the acts alleged for this count. The error was harmless beyond a reasonable doubt.

### Admission of Evidence

Ayodeji argues that the trial court abused its discretion by admitting a Christmas card and accompanying letter that Ayodeji sent to his family while there was a no-contact order in place. Ayodeji claims it was improper to admit it under ER 404(b) because the letter is proof that he violated the no-contact order. We hold that the trial court did not err because the substance of the letter was relevant and the State was not using it to show that Ayodeji violated the no-contact order.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Relevant evidence is generally admissible. ER 402. Evidence of a defendant's other bad acts is not admissible to show that the defendant has a propensity to commit crimes. ER 404(b). But it is admissible for other purposes, including "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

We review evidentiary decisions for an abuse of discretion. State v. Thang,

145 Wn.2d 630, 642, 41 P.3d 1159 (2002). A trial court abuses its discretion if the decision is manifestly unreasonable or based on untenable grounds or reasons. Thang, 145 Wn.2d at 642.

Here, the trial court admitted a letter that Ayodeji sent to Ruth after his arrest. Sending the letter was a violation of the no-contact order the court had imposed after Ayodeji's arrest. In the letter, Ayodeji repeatedly mentioned Christian values of forgiveness and unconditional love.

The State sought to introduce the letter to show how Ayodeji attempted to manipulate and control Ruth and their children, and to illustrate cultural expectations within their religion. Ayodeji objected because the letter would be evidence that Ayodeji violated the no-contact order. The State explained that it was interested in only the substance of the letter and offered to "avoid introducing evidence that [sending the letter] was violative of a court order."[27]

The court admitted the letter on the grounds that the cultural aspect and the letter's effect on Ruth were relevant. Because the State made it clear that Ayodeji's violation of the no-contact order would not be the focus of its evidence, the trial court admitted the letter simply as relevant evidence under ER 401, intending that the State would not use it as evidence of prior bad acts.

At trial, the State asked Ruth when she received the letter. Although Ruth mentioned that it was sent "after the restraining order [was] in place," the State did not pursue that angle during Ruth's testimony.[28] Then, during Ayodeji's cross-examination of Ruth, and Ayodeji's direct examination, Ayodeji brought up his

---

[27] RP (July 22, 2014) at 17.
[28] RP (July 25, 2014) at 9.

numerous past arrests for domestic violence. At that point, once Ayodeji had opened the door, the State discussed Ayodeji's history of domestic violence.

The trial court properly admitted the letter as relevant evidence. It was Ayodeji's own actions that allowed the State to discuss his prior bad acts.

## Legal Financial Obligations

The trial court waived most discretionary legal financial obligations (LFOs) but did impose a $100 domestic violence fee. That fee is discretionary. RCW 10.99.080(1). The trial court may not impose discretionary LFOs without conducting an individualized inquiry into the defendant's ability to pay. RCW 10.01.160(3); State v. Blazina, 182 Wn.2d 827, 838, 344 P.3d 680 (2015). Here, the trial court did not make any individualized inquiry into Ayodeji's ability to pay. We remand for the court to make that individualized inquiry.

## Statement of Additional Grounds for Review

Ayodeji raises numerous alleged errors in his statement of additional grounds for review. None merit reversal.

Ayodeji contends that there was insufficient evidence to support his convictions because there was no medical testimony corroborating E.A.'s and F.A.'s allegations. Medical evidence is not required for these charges. See, e.g., State v. Hayes, 81 Wn. App. 425, 439, 914 P.2d 788 (1996) (finding sufficient evidence to support child rape charges without medical testimony).

Ayodeji argues that the trial court erred by admitting the video evidence of E.A. performing oral sex. Ayodeji seems to be objecting to the admission of the video on the basis that Ruth found the SD card containing the video in his car. He

22

does not suggest that there was any illegal search or seizure.

Ayodeji argues that his trial counsel was ineffective for failing to move to suppress this video evidence. The video is direct evidence of one of the charges. Ayodeji offers no valid basis for suppressing it.

He also argues that Ruth's opinion testimony, identifying him as the male in the video and pictures was improper. Ruth properly testified that she believed the man in the pictures was Ayodeji based on her personal knowledge. ER 602; State v. Vaughn, 101 Wn.2d 604, 611, 682 P.2d 878 (1984).

Ayodeji argues that the trial court erred by denying his several motions for new counsel. Some of the motions are not in the record and some of Ayodeji's arguments rely on evidence that is not in the record. We do not review those motions or arguments. See RAP 10.10(c).

In the middle of trial, Ayodeji moved for assignment of new counsel and for a mistrial. His argument for both motions was that his attorney provided ineffective assistance by not objecting to leading questions and not cross-examining the witnesses sufficiently. The trial court denied both motions. Trial counsel's decision to object or not object to evidence is a "classic example" of trial tactics. State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). None of these decisions were egregious enough to warrant a new trial. Madison, 53 Wn. App. at 763.

Ayodeji complains that, while the State turned over the video evidence to his trial counsel, he was not allowed to see it, in violation of CrR 4.7(a)(1)(v). Although Ayodeji's counsel confirmed that Ayodeji had not seen the video as of July 22, 2014, "because there was no way to bring him into the secured viewing

area" where counsel watched it, Ayodeji's trial counsel's comment does not provide enough context for this court to evaluate the issue.

Ayodeji also argues that the State violated <u>Brady</u> by failing to introduce, during trial, evidence that allegedly exculpated Ayodeji. <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 87-88, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Although the State has a duty to disclose exculpatory evidence to the defense, the State does not have a duty to introduce exculpatory evidence at trial.

Finally, Ayodeji argues that the prosecutor committed misconduct during his closing statement and at sentencing. Ayodeji did not object to the prosecutor's comments at either time. None of the prosecutor's comments, at either stage of trial, appear flagrant or ill-intentioned. They do not warrant reversal. <u>State v. Coleman</u>, 155 Wn. App. 951, 956-57, 231 P.3d 212 (2010).

We affirm the judgment and sentence, but remand for the trial court to make an individualized inquiry into whether Ayodeji can pay the domestic violence LFO.

_Trickey, ACJ_

WE CONCUR:

_Dwyer, J._        _Becker, J._